[No. D020000. Fourth Dist., Div. One. Mar. 16, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
HERMOGENES DeGUZMAN, Defendant and Appellant.

**COUNSEL**

Robert Wayne Gehring, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Jean Hume, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—Hermogenes DeGuzman (DeGuzman) appeals a trial court ruling revoking his status as an outpatient and returning him to Patton State Hospital (Patton). He contends the court erred in using a lesser standard of proof than "beyond a reasonable doubt," and in considering concerns of public safety in determining that his outpatient status should be revoked.

### FACTUAL AND PROCEDURAL BACKGROUND

DeGuzman is a paranoid schizophrenic. In 1975 he stabbed his wife to death and then unsuccessfully attempted to take his own life. The trial court found him not guilty of murder by reason of insanity (Pen. Code,[1] §§ 1026, 187) and directed that he be confined for life as the maximum term of commitment.

In May 1991 DeGuzman was admitted to the Conditional Release Program (CONREP) administered by the Forensic Mental Health Division of the San Diego County Department of Health Services.[2] CONREP is an involuntary treatment program created by the Legislature and includes requirements for treatment and supervision.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] DeGuzman had been released to community outpatient care in 1981, but in 1983 he was placed at a Veterans' Administration (V.A.) hospital and then returned to Patton after he

On June 25, 1993, the CONREP director, following the procedures required by section 1608, requested revocation of DeGuzman's outpatient status on the following bases:

(1) On June 21, 1993, while in group therapy DeGuzman made threatening remarks against Filipino women and reiterated this thought the next day.

(2) DeGuzman had complained of rectal bleeding but failed to keep medical appointments, thus placing himself in physical danger.

(3) DeGuzman was experiencing a psychiatric decomposition, with new delusional material about having a woman in his body. He also had become increasingly paranoid and agitated.

(4) DeGuzman failed to keep an appointment with the CONREP psychiatrist on June 25, 1993, indicating he was unwilling to comply with outpatient psychiatric treatment.

(5) DeGuzman stated he would leave for a trip to San Francisco with his family without permission from the CONREP director.

At a hearing on revocation of DeGuzman's outpatient status, CONREP representatives testified that DeGuzman was not manageable in the outpatient treatment program and needed extended inpatient treatment. DeGuzman's witnesses, however, testified that they had not noticed changes in DeGuzman's thinking and behavior.

CONREP psychologist Edmund Bienkowski (Bienkowski), who led DeGuzman's weekly group therapy meetings, testified that at a June 21, 1993 group therapy session DeGuzman talked about Americanized Filipino women and said, "if anybody messed with him again, that rather than stab them in the stomach this time, that he would take a knife and cut them in the face."[3] Bienkowski stated DeGuzman had failed to keep appointments at the V.A. hospital regarding rectal bleeding because he feared that a student doctor would remove his ovary and he believed he had a menstruating woman in his body. Bienkowski opined that DeGuzman would continue to deteriorate on outpatient status and that a safe and structured environment would be beneficial.

Jayne Schmuecker (Schmuecker), DeGuzman's primary therapist and case manager, testified DeGuzman was experiencing a psychiatric decompensation and becoming increasingly paranoid, agitated and irritable. She said that

---

stated he had a knife. He was released again in 1984, but was sent back to Patton in 1986 when the court determined his release was illegal.

[3] DeGuzman's wife, whom he killed by stabbing her in the stomach, was Filipino.

when she visited him at his group home on June 22, 1993, he was calm, but he repeated his threat about cutting the face of a Filipino woman. Schmuecker testified that she previously had warned DeGuzman about his interactions with women and his spending nights away from his group home against CONREP rules. She said she reminded him that he must seek permission from CONREP to accompany his parents on a planned trip, but he said he would go even without permission. She also told of DeGuzman's failure to keep appointments to treat his rectal bleeding problem. She opined that DeGuzman could not be managed on outpatient treatment and would benefit from extended treatment at Patton.

CONREP psychiatrist Donald Williams (Williams), who gave DeGuzman biweekly injections to control his mental illness, opined that DeGuzman always had difficulty with outpatient treatment and that his earlier delusions were reappearing. Williams stated a structured inpatient setting would be beneficial.

A psychiatric nurse at the V.A. testified that DeGuzman appeared to be deteriorating. The nurse said DeGuzman told him Schmuecker was a white woman with a Filipino woman zipped inside of her and Schmuecker was engaging in sexual activity while preventing DeGuzman from doing so. A forensic psychiatrist evaluated DeGuzman and testified that he needed inpatient treatment and posed a risk of danger.

*Witnesses for DeGuzman*

The assistant administrator at DeGuzman's group home stated that De-Guzman had telephoned her every day for several months and she had willingly gone out with him for meals and shopping. She saw no deterioration in DeGuzman's thinking. The group home manager said he also saw no deterioration, although he stated DeGuzman told him he (DeGuzman) had been menstruating.

DeGuzman's father testified that he saw DeGuzman daily and had noticed no difference in him during June 1993. He said he had never heard DeGuzman make threatening remarks about Filipino women. DeGuzman's sister said she also had noticed no change except that DeGuzman seemed depressed. Her husband also testified that he had noticed no change in DeGuzman. DeGuzman's legal fiduciary also saw no deterioration.

Clinical psychologist Katherine DiFrancesca had evaluated DeGuzman over about a 10-year period and had observed how he went through cycles of delusions. She disagreed with some aspects of CONREP's treatment of

DeGuzman and stated that his being at Patton had sometimes increased his symptoms.

Psychiatrist Gail Waldron recommended a change in DeGuzman's medication and opined that DeGuzman wanted to cooperate with the outpatient program and could be maintained outside of a locked facility.

DISCUSSION

I

■ DeGuzman contends the trial court erred in requiring the prosecution to show only by clear and convincing evidence that his outpatient status should be revoked. He argues the proper standard of proof for revocation under section 1608, the statutory basis for revocation in this case, is beyond a reasonable doubt. DeGuzman is incorrect. Clear and convincing evidence supporting revocation was presented, but a showing of a preponderance of the evidence would have been sufficient.

Section 1609 provides that if the prosecutor believes an outpatient poses a danger to public safety, the prosecutor may petition for a hearing on revocation of the patient's outpatient status, using the same standards as those used in conducting probation revocation hearings under section 1203.2. Probation revocation proceedings are not a part of a criminal prosecution, and the trial court has broad discretion in determining whether the probationer has violated probation. (*People* v. *Rodriguez* (1990) 51 Cal.3d 437, 443 [272 Cal.Rptr. 613, 795 P.2d 783].) The standard of proof required is a preponderance of the evidence supporting revocation. (*Id.* at p. 442.)

Under section 1608, if an outpatient's supervisor believes that the patient (1) requires extended inpatient treatment or (2) refuses to accept further outpatient treatment and supervision, the community program director shall inform the court and request revocation of outpatient status. The court must then hold a hearing and either grant or deny the request. The statute does not specify the standard of proof required.

As DeGuzman notes, section 1608 focuses on an outpatient's well-being, while section 1609 is concerned with protecting community safety. However, we can discern no reason why the standard of proof required in a hearing under section 1608 would be higher than that required in a hearing under section 1609. Like revocation of probation, revocation of outpatient status under either section does not deprive a person of absolute liberty but rather deprives him of a conditional liberty to which he is entitled only if he

observes special restrictions. Although revocation of outpatient status requires due process, it is not part of a criminal prosecution requiring the higher standard of proof. (See *People* v. *Rodriguez, supra,* 51 Cal.3d at p. 442.) If the outpatient community program director requests revocation of outpatient status under section 1608, the court must hold a de novo hearing which includes "the constitutional requirements of confrontation, cross-examination, and a fact-finding hearing by a neutral body applying a preponderance of the evidence standard of proof." (*In re McPherson* (1985) 176 Cal.App.3d 332, 340 [222 Cal.Rptr. 416], fn. omitted.)

We disagree with DeGuzman's argument that the potential loss of liberty and the stigma attached to outpatient revocation mandate the higher standard of proof required in a criminal trial. We also reject his arguments regarding initial commitment proceedings and proceedings to extend a commitment. His commitment has not been extended beyond the original maximum term.

■ Substantial evidence supports the trial court's decision to approve the CONREP director's request. The CONREP representatives testified that DeGuzman could no longer be maintained on outpatient status and that he needed extended inpatient treatment. Each of these individuals met with DeGuzman on a regular basis and was responsible for his treatment and supervision. They all agreed he was no longer manageable in the CONREP outpatient program; he needed extended inpatient treatment; and his delusional statements indicated he posed a possible danger to public safety. The evidence presented constitutes substantial evidence supporting revocation.

II

■ DeGuzman also contends the trial court erred in basing revocation under section 1608 on concerns for public safety. Section 1608 requires a finding that the patient needs extended inpatient treatment or refuses to accept further outpatient treatment. It does not require the court to find that the patient is a danger to the health and safety of others.

The trial court ruled orally from the bench, expressing concern about the delay which would result from the issuance of a written opinion and wishing to move DeGuzman's status to that of treatment rather than jail confinement. The court then reviewed DeGuzman's background and disposition in detail, covering over 10 pages of reporter's transcript. The judge evidenced concern about DeGuzman's need for treatment and discussed how various alternative treatment settings might assist DeGuzman's recovery. The judge clearly considered and relied upon his determination, expressed in various ways in his statement from the bench, that DeGuzman needed extended inpatient

treatment. It is true that the judge also expressed his concern for public safety and about DeGuzman's dangerousness if he were continued in outpatient treatment. Considering that murder was the crime for which DeGuzman was tried (and found not guilty by reason of insanity), the judge's concern is most understandable.

If a court determines to return a patient to extended inpatient treatment because of a finding of a need for such treatment, we see no error or prejudice in the judge's also considering the possible danger to the public which might result from continued outpatient treatment. Although sections 1608 and 1609 are based on different grounds for revocation of outpatient status, the grounds are somewhat interrelated. A person such as DeGuzman who is found because of delusional tendencies to be a danger to the public rather obviously is in need of extended inpatient treatment. Consideration of public safety will always be, we believe, an integral part of placement or continuance of a patient in outpatient status.[4] The court therefore did not err in considering the question of public safety when it decided to revoke DeGuzman's outpatient status.

### DISPOSITION

The order is affirmed.

Work, Acting P. J., and Midlam, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied June 14, 1995.

---

[4]For example, former section 1026.2 (repealed on Jan. 1, 1995, and replaced by new § 1026.2) set out procedures for determining release from a state hospital because of restoration of sanity, and subdivision (e) of that section required a showing that the person who is applying for a restoration of sanity would not be a danger to others if under supervision and treatment in the community. Sections 1602 and 1603 provide that a person found not guilty by reason of insanity may be placed on outpatient status if the director of the state hospital informs the court that such person will not pose a danger to the community.

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.