Filed 10/24/13  P. v. Sheppard CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243354 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA017693) |
| v. | |
| JAMES SHEPPARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Affirmed.

Jean Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In 1994, defendant and appellant James Sheppard was found not guilty by reason of insanity of attempted murder and assault with a deadly weapon causing great bodily injury. In 2012, defendant was released from state hospital and placed in an outpatient treatment center. After defendant went on absent without leave (AWOL) from the center, the trial court revoked his outpatient status and ordered him back to the state hospital. He contends on appeal that the revocation order violated his due process rights. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

#### A. *Facts underlying defendant's commitment to state hospital.*[1]

In July 1994, "while in an acutely psychotic state precipitated by the sudden cessation of alcohol use, [defendant] entered the home of an elderly woman and stabbed her with a knife. He then went to the office of her brother, with whom he had a complex and conflicted relationship. He hit the man, knocking him to the ground, and then kicked him in the head. The man's relationship to [defendant] reportedly included elements of father, benefactor/employer, and lover. However, [defendant] has stated experiencing a great deal of ambivalence and feeling uncomfortable about the sexual relationship. He has a significant history of alcohol to which his conflicted feelings about the relationship contributed. He was experiencing withdrawal from alcohol at the time of the incident, which contributed to command auditory hallucinations telling him to punish the victims and delusional beliefs that the two victims were his parents and, thus, he was the product of incest."

---

[1] The facts are from the notification to the trial court that defendant had gone AWOL from his outpatient placement.

Defendant was charged with attempted murder and two counts of assault with a deadly weapon causing great bodily injury. He was found not guilty by reason of insanity (Pen. Code, § 1026)[2] and placed in Patton State Hospital with a maximum term of commitment for life. Defendant's primary psychiatric diagnosis was alcohol-induced psychotic disorder.

B.      *History of defendant's outpatient placements.*

Defendant was first released from state hospital in March 1998, but he was readmitted in May 1998 after drinking alcohol and leaving the treatment facility. He also violated the terms and conditions of his treatment by maintaining contact with his male victim.

He was released a second time to a community outpatient treatment program in April 2000. After leaving the facility without permission, he failed an alcohol and drug screening in November 2000. He was missing until February 2001 and returned to Patton in May 2001.

Defendant was released a third time to a locked rehabilitation facility in January 2006. In August 2006, however, he jumped a fence and bought alcohol, which he shared with his peers on his return to the facility. He reportedly intimidated his roommate into drinking with him. After going AWOL from the facility, he was readmitted to Patton in September 2006.

C.      *Defendant's current release to an outpatient program.*

In 2011, Dr. Anna Kafka, a psychologist and evaluation manager for Gateways Conditional Release Program (CONREP), evaluated defendant for outpatient placement from Patton to CONREP, and he was approved for release to that facility, where he lived. Defendant signed an agreement concerning the terms and conditions of his release to CONREP. He agreed not to have alcohol, to leave the premises only with the permission of his outpatient supervisor, to provide all information about his finances to CONREP, and to obtain approval of all people he wanted to contact.

---

**2**      All further undesignated statutory references are to the Penal Code.

On the morning of April 22, 2012, defendant signed out from CONREP with a "buddy pass"—a pass allowing defendant to leave with a peer—to go to church. When the peer decided not to go, defendant left alone, in violation of CONREP's rules. After going to church, defendant drank and spent the night outside. The next morning, he took a bus to Pasadena to visit Clayton Gibson, the nephew of his male victim. This nephew also managed defendant's money, and defendant asked him to transfer $500 to Geraldine West, the elderly mother of a patient at Patton.[3]

After leaving the nephew, defendant, later that night, was admitted to the Alhambra Medical Center just before 9:00 p.m. He had a blood alcohol content of .431 and lacerations above his left eye and on his hands. According to the medical records, a passerby called 911 after finding defendant lying on the sidewalk. At that time he voiced no cardiac or respiratory complaints. Defendant, however, told Dr. Kafka that after leaving church he had a heart attack and fainted, which was how he ended up in the hospital. According to hospital staff, there was no indication defendant suffered a recent heart attack. After being in the hospital for about 12 hours, defendant pulled out his I.V. and left against medical advice.

Eight hours later, about 5:30 p.m. on April 24, he was readmitted to the hospital, after being found asleep in front of a church. His blood alcohol content was .421, and he did not complain of cardiac symptoms. After being at the hospital for about three and one-half hours, defendant again left against medical advice. Defendant told Dr. Kafka that he walked to Seal Beach, where Geraldine West lived, intending to see her. Police detained him in the early morning hours and took him to St. Mary's Medical Center because he reported having a heart attack.

> D. *Experts' opinions.*

In Dr. Kafka's opinion, defendant's outpatient status should be revoked based on his "history, remote history in CONREP as well as recent history in CONREP, and his current functioning." This was defendant's third time in CONREP and his fourth time on

---

**3** CONREP patients are sometimes allowed to have outside funds, but approval from the treatment team must be obtained first.

conditional release. Defendant had been unable to maintain sobriety and comply with rules for more than a little over seven months; hence, he was unable to complete a year of outpatient treatment successfully. Dr. Kafka found the circumstances of this "AWOL were particularly alarming," because he was drinking heavily and was en route to the home of "a wealthy elderly woman" who did not know he was coming and to whom he had sent money. "So it was setting the stage for a scenario where he was going to show up unannounced at the home of this woman, asking for his money, while heavily inebriated or perhaps by that point withdrawing from alcohol because of lack of funds, and it was setting the stage for reoffense."

When Dr. Kafka discussed what happened with defendant, he lacked insight. He said that CONREP's rules and being in the system triggered his drinking, and that if he were free of CONREP and could be his own man and do just an alcohol rehabilitation program, then he wouldn't have this problem. Based on this, Dr. Kafka said that defendant "is clearly not where we thought he was in terms of his understanding about his potential for relapse and his potential for violence, as well as his understanding of the things that trigger relapse and violence." He does not even appear ready to have a conversation about this, "to accept feedback from others about what really may be at the root of these things and what needs to be done to manage it. So for that—for those reasons, we believe he is not somebody who can be managed in outpatient at this time. He needs to return to the state hospital and receive intensive long-term treatment there." This was the unanimous opinion of the administration at CONREP.

From December 2011 to April 22, 2012, defendant was a client of Diane Levy, a forensic clinician and primary therapist at Gateways Satellite. Levy testified that she met with defendant once a week and, until he went AWOL, defendant said he was doing well. During their therapy sessions, Levy and defendant discussed his alcoholism. In Levy's opinion, defendant's outpatient status should be revoked. He needs extended inpatient treatment to learn to recognize warning signs and triggers for his behavior. Levy acknowledged, however, that defendant had not had a relapse of his psychotic symptoms during any of his prior outpatient failures.

5

## II.     Procedural background.

On April 26, 2012, Levy and CONREP's clinical supervisor and program coordinator filed with the trial court a notification defendant had gone AWOL and a request for revocation of his outpatient status. After a revocation hearing, the trial court, on August 8, 2012, revoked defendant's outpatient status and returned him to Patton State Hospital.

## DISCUSSION

## I.     Revocation of defendant's outpatient status did not violate his due process rights.

Defendant makes three arguments why the judgment revoking his outpatient status should be reversed: first, the trial court abused its discretion and violated defendant's due process rights by failing to consider an alcohol recovery program as a placement opinion; second, committing defendant to a state hospital violated his due process rights because he does not currently have a mental illness; and, third, the evidence did not establish by clear and convincing evidence that defendant was demonstrably dangerous.

"An insanity acquittee committed to a state hospital may be released from the hospital as provided by [Penal Code] section 1600" and companion sections. (*People v. McDonough* (2011) 196 Cal.App.4th 1472, 1490.) If at any time during the outpatient period, the outpatient treatment supervisor is of the opinion the patient requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the supervisor shall make a written request for revocation of the person's outpatient status and the court shall hold a hearing on the request. (§ 1608.) Unlike section 1609,[4] section 1608 does not require a showing of dangerousness. It focuses on the treatment of the outpatient, while section 1609 is concerned with the safety of the community. (See *People v. DeGuzman, supra*, 33 Cal.App.4th at pp. 419-420 ["section 1608 focuses on an outpatient's well-being, while section 1609 is concerned with protecting community

---

[4]     Section 1609 provides that the prosecutor may petition for revocation of outpatient status. A petition under section 1609 must show that the person is a danger to the health and safety of others. (*People v. DeGuzman* (1995) 33 Cal.App.4th 414, 419-420.)

safety"]; *In re McPherson* (1985) 176 Cal.App.3d 332, 339-340.) Section 1608 does not specify the standard of proof. (*DeGuzman*, at p. 419.) But section 1609, providing for revocation of outpatient status based on danger to the community, specifies that the standards are the same as those applicable to probation revocation hearings, which require a preponderance of the evidence. (*DeGuzman*, at pp. 419-420; *In re McPherson*, at p. 340.)

The standard of review of an order revoking outpatient status is unclear. *DeGuzman* applied a substantial evidence standard of review. (*People v. DeGuzman, supra,* 33 Cal.App.4th at p. 420; see also *In re McPherson, supra,* 176 Cal.App.3d at pp. 341-342.) The Attorney General applies an abuse of discretion standard of review. (See *People v. McDonough, supra,* 196 Cal.App.4th at p. 1489 [applying the abuse of discretion standard of review to an order denying, as opposed to revoking, outpatient status].) We need not decide which standard of review applies, because under either, the trial court's order revoking defendant's outpatient status met the standard.

Defendant's first contention is that the trial court violated his due process rights by failing to consider sending him to an alcohol treatment program. At issue, however, was defendant's *fourth* release to an outpatient program. On the three prior occasions defendant was released from state hospital to an outpatient facility, he violated the terms and conditions of his release by drinking alcohol and leaving the facility without permission. Defendant's current release was no different. He left the premises on a "buddy pass," although he was unaccompanied. While gone, he drank, becoming so intoxicated he passed out and had to be taken to the hospital, where his blood alcohol level was found to be well above the legal limit. Against medical advice, defendant left the hospital but was readmitted hours later, still with a blood alcohol content above the legal limit. Defendant again left the hospital but was detained by police. In addition to the overwhelming evidence that defendant was drinking, the circumstances of this incident was "particularly alarming" to Dr. Kafka, because defendant tried to see an elderly lady. This was reminiscent of defendant's underlying crime, which involved him stabbing an elderly woman. Both Dr. Kafka and Levy, defendant's therapist,

7

recommended revoking defendant's outpatient status. They both said that defendant lacked understanding about his potential for relapse and for violence. According to Dr. Kafka, the entire CONREP administration agreed that defendant's outpatient status should be revoked.

Despite this overwhelming evidence supporting the trial court's decision, defendant argues he should have been placed in an alcohol rehabilitation program, because he has never had a second psychotic episode induced by his drinking. The trial court expressly said it was not considering that option. Given that defendant's alcohol abuse was a focus of his therapy sessions with Levy and defendant nonetheless drank each time he was placed in an outpatient setting, the court's decision not to consider the option of such a program, which, in any event, was not the issue before the court, was supported by the record.

Defendant relies on *Foucha v. Louisiana* (1992) 504 U.S. 71, to support his second argument that revocation of his outpatient status violated his due process rights because he is no longer mentally ill. *Foucha* reiterated that an "acquittee may be held as long as he is both mentally ill and dangerous, but no longer." (*Id.* at p. 77.) In *Foucha*, however, the state conceded that the defendant no longer suffered from a mental illness, although he did have an antisocial personality. No such concession was made by the state here. In fact, the evidence was that defendant drank so heavily, he passed out and visited the nephew of his victim. Although Dr. Kafka and Levy acknowledged that there was no evidence defendant's ongoing alcohol abuse caused him to have other psychotic episodes, they did not say that his primary diagnosis of alcohol induced psychosis was no longer valid. It may be defendant's opinion he suffers only from alcoholism, but that was not the experts' opinions. Defendant offered no contrary expert opinion concerning his mental condition.

Again citing *Foucha*, defendant finally argues that although section 1608 does not require a showing of dangerousness by clear and convincing evidence, such a showing is

constitutionally mandated.[5]  (*Foucha v. Louisiana, supra,* 504 U.S. at p. 80 ["The State may also confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous' "]; see also *People v. DeGuzman, supra,* 33 Cal.App.4th at p. 420 ["Section 1608 requires a finding that the patient needs extended inpatient treatment or refuses to accept further outpatient treatment.  It does not require the court to find that the patient is a danger to the health and safety of others"].)  The first problem with this argument is that this case does not concern whether defendant should be committed or whether his commitment should be extended.  The issue here concerns whether his outpatient status should be revoked, namely, in what placement should his treatment continue.

The second problem with defendant's argument is that even if we agreed a dangerousness finding was necessary, the trial court made that finding.  The court, after noting that defendant, while AWOL, had enough alcohol in his system to kill himself and that he contacted his victim's relative, said:

"I don't have to find that you are a danger to other people here, at least as I understand the rules here.  Under [section] 1608, when it's the program that is requesting revocation, as opposed to a prosecutor, if there is sufficient evidence to establish that you need extended inpatient treatment or you refuse to accept further outpatient treatment, supported by competent evidence, then your status can be revoked and rightly should be revoked if those findings exist.

"But as I was listening to the testimony unfold and understanding what was going on, that you put yourself in such a high state of intoxication where you wind up in a hospital with a gash over your eye, any reasonable person would say that you are a danger to yourself under those conditions, let alone other people.  And as I say, if we were to take this scenario and extend it to a more private setting where you were not on the sidewalk or out in the public or in some place where someone could find you and bring you into a hospital, at some point in time you have to withdraw from that alcohol,

---

**5**      Defense counsel did raise an objection in the trial court under *Foucha* that defendant was not currently mentally ill.

and that brings us to the original diagnosis that led you to your commitment in the first place.  Alcohol and its abuse in your life and those other diagnoses that you feel were one time affairs are inextricably tied together."

"But I am finding that there was sufficient evidence to convince me that you are in need of extended inpatient treatment and that, based upon the totality of evidence that I heard, you are not in a condition to accept further outpatient treatment, based upon your statements, your attitude, and your conduct in April that led you to this courtroom today.  I'm also, though I'm not required to consider the possibility of your danger to the public, I am finding also that based upon your conduct after you AWOL-ed from your CONREP facility in this particular instance, which formed a pattern of AWOLs that pre-existed your current dilemma, that you do in your actions constitute a danger to the public.  And I believe that these are directly tied into the diagnoses for which you were originally committed."

These statements show that the trial court expressly found that defendant was a danger to himself and to others.  We therefore reject defendant's contentions that his due process rights were violated.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.