Filed 11/18/14  P. v. Scarpaci CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PATRICK COLE SCARPACI,<br><br>        Defendant and Appellant. | A138406<br><br>(Solano County<br>Super. Ct. No. VCR157924) |

## I.

## INTRODUCTION

Patrick Cole Scarpaci appeals from the trial court's order of April 5, 2013, revoking his outpatient status, pursuant to Penal Code section 1609.[1]  He contends the court's finding under that section that appellant is a danger to the health and safety of others is not supported by substantial evidence.  We affirm.

## II.

## PROCEDURAL HISTORY[2]

On August 28, 2002, the Solano County District Attorney filed an information charging appellant with the first degree murder of his mother, Kathryn Scarpaci.  (§ 187,

---

[1]  All further statutory references are to the Penal Code, unless otherwise indicated.

[2]  Because the challenged order was issued solely based on the testimony presented at the section 1609 hearing, we do not find it necessary to recite appellant's relatively long criminal and mental health histories chronicled in the record.

1

subd. (a).)  Ultimately, on May 16, 2003, a plea bargain was entered pursuant to which appellant pleaded no contest to first degree murder, and the prosecutor stipulated to mental health assessments which concluded that appellant was not guilty by reason of insanity.  It was further agreed that appellant could be committed to a state mental hospital for life.  On June 10, 2003, appellant was committed to the Solano County Department of Mental Health for placement at Patton State Hospital under section 1026, subdivision (b) for a maximum term of life.

On August 14, 2009, the court found that appellant was no longer a danger to himself or to the community and, pursuant to section 1604, ordered his conditional release to the Solano County Conditional Release Program (CONREP) for outpatient placement, supervision and monitoring.  In 2010 and 2011, the court conducted annual hearings pursuant to section 1606 and continued appellant's outpatient status.  However, in September 2010, appellant was detained and placed on a 40-day temporary hospitalization after violating the conditions of his outpatient placement.  In July 2012, appellant was hospitalized again after he began showing symptoms similar to those he displayed when he killed his mother.  In October 2012, the court filed an order continuing appellant's outpatient status for another year after appellant stipulated that he would remain in Napa State Hospital and comply with all CONREP directives.

On January 23, 2013, the prosecutor filed a petition under section 1609 to revoke appellant's outpatient status on the ground that he was a danger to the health and safety of others if he remained in outpatient status.[3]  At the time, appellant remained housed at

---

[3]  Section 1609 states, in relevant part:  "If at any time during the outpatient period or placement with a local mental health program pursuant to subdivision (b) of Section 1026.2 the prosecutor is of the opinion that the person is a danger to the health and safety of others while on that status, the prosecutor may petition the court for a hearing to determine whether the person shall be continued on that status. . . .  If, after a hearing in court conducted using the same standards used in conducting probation revocation hearings pursuant to Section 1203.2, the judge determines that the person is a danger to the health and safety of others, the court shall order that the person be confined in a state hospital or other treatment facility which has been approved by the community program director."

Napa State Hospital but the prosecutor had learned that CONREP was considering recommending that he be released to resume his outpatient status. The prosecutor believed that appellant continued to pose a danger to the health and safety of others and, therefore, requested that his outpatient status be discontinued pursuant to section 1609.

A hearing on the petition took place on April 5, 2013, at the conclusion of which the court ordered that appellant's outpatient status be revoked and that he be confined to a state hospital or treatment facility approved by the Napa State Hospital. This timely appeal followed.

## III.

## EVIDENCE PRESENTED AT REVOCATION HEARING

### A. Prosecution Evidence

Evidence supporting the section 1609 petition consisted of the expert and percipient testimony of Marco Sanchez, a licensed mental health clinician employed by Solano County Health and Social Services. Sanchez testified as an expert in the area of diagnosis and treatment of mental disorders and an individual's level of dangerousness. In addition, Sanchez, who was appellant's CONREP case manager, provided extensive testimony about events that occurred when appellant was in outpatient status.

Sanchez, who has worked in the social services field for more than 26 years, has a B.S. degree in criminology and an M.S. degree in counseling with an emphasis on psychology-based marriage, family, and child counseling. He is also a licensed family therapist. In 1987, Sanchez began working as a public therapist in a juvenile sex-offender program and, by the end of his 10 years of employment there, Sanchez was a senior facility manager. His work included counseling, determining compliance with program rules, and seeing that the juveniles' treatment goals were being met. Sanchez began doing risk assessments when he left the juvenile program to work for Yolo County where he was the lead clinician in the violence court and drug court. This work included determining if persons in the program were dangerous and could continue living in the community safely. He made about 60 assessments every year and did so for six years. Part of this risk assessment was to identify what mental health disorders the clients had,

3

and other problems that required more intervention than the program provided. He would give his opinion to probation officers about whether the client should be out-placed. When Sanchez moved from Yolo County to Solano County he began working with sex-offense probationers. Soon after he arrived in Solano, he started working with that county's psychiatric emergency team doing two to three Welfare and Institutions Code section 5150 evaluations each week, evaluations which required Sanchez to make assessments of whether the clients presented a danger to themselves or others.

About three and one half years ago, Sanchez began working with CONREP. As a case manager, his work includes conducting face-to-face assessments, making group contacts, and making home visits. His training has included administration of the historical risk clinical assessment (HR-20), and psychopathic checklist work. As a CONREP representative, Sanchez has also made recommendations to courts regarding risk assessments for dangerousness. He has testified about his assessment work approximately 12 times, and has offered expert opinions in four or five of those cases. His expert witness experience includes offering opinions in Solano County cases involving the same issue as that involved here.

Substantially all of Sanchez's career in mental health has involved people with violent histories, including violent sex offenders, murderers, and gang members. He has met with clients both in his office and in the community. In some cases he was called out to the field by law enforcement to make an immediate assessment as to what the police should do with a detained individual.

Sanchez began working with appellant in February 2010 when appellant was placed in a residential treatment facility. As appellant's first CONREP case manager, Sanchez was familiar with appellant's crime. Appellant committed his offense at a time when he was not getting along with his mother; she wanted him to go to school and follow her other rules and he was being defiant. Sanchez was also familiar with the details of the charged murder; appellant stabbed his mother in her jugular vein, took her head by the hair and slammed it against concrete, then pulled out one of her eyeballs with his hand and cut the other one out with the knife he used to stab her. After killing her,

4

appellant bathed her and stuffed her body in a plastic hamper which he put in the truck of her car. Finally, Sanchez was familiar with reports regarding appellant's mental and emotional condition at the time of the offense which indicated that appellant was paranoid and delusional. He thought people were trying to poison him and apparently also believed that his mother was an alien, and he wanted to see "what made her tick." This information was important to know so Sanchez could monitor appellant's symptoms, attempt to decrease his "stressors," and provide intervention if appellant began to decompensate.

At the section 1609 hearing, Sanchez testified about several key events during appellant's outpatient experience. On May 3, 2010, appellant began living independently at a home in Fairfield. He was classified as "level one," which meant he received the maximum services and most intense treatment that CONREP could provide, including weekly individual contact, home visits, and substance abuse testing. Sanchez transported appellant between his home in Fairfield and group meetings and clinic appointments in Vallejo which gave them more time for individual contact. Indeed, Sanchez estimated that he saw appellant at least five times a week.

In September 2010, appellant's case was moved from level one to less restrictive level two care. Appellant immediately began to experience problems complying with the conditions of the program which required, among other things, that he attend Alcoholics Anonymous meetings twice a week, comply with a curfew, not fraternize with a known felon, and report any police contact. These restrictions were important because they would protect appellant from negative influences, address prior substance abuse problems, and facilitate a healthy integration into the community. However, a few days after appellant was moved to level two care, he went to a bar and, some time after that, he was pulled over by the police. Appellant failed to report the incident to CONREP, but his companion did. Sanchez met with appellant to review the conditions of his independent living but appellant did not disclose the incident and when Sanchez confronted him about it, he tried to minimize the event. At that point, appellant was returned to level one status.

5

In September 2010, CONREP recommended that appellant be returned to the state hospital in a report that Sanchez prepared. Appellant's behaviors were similar to the way he acted at the time he killed his mother. He was not following any of the rules, was oppositional, stayed up all night, and was preoccupied with his music. He missed group sessions and appeared to be asleep when he did attend. Then, during a home visit, Sanchez found three or four people who had spent the night sleeping in appellant's apartment. Appellant, who had neglected his home and his personal hygiene, seemed unaware that his acquaintances were disturbing his apartment mate, another CONREP client. More troubling, one of the guests was a convicted felon.

Sanchez testified that CONREP recommended that appellant be hospitalized because he was "at risk of becoming dangerous." His symptoms paralleled his prior offense, he was not complying with the requirements of the program and he needed to be hospitalized to reevaluate his medication. Accordingly, appellant was returned to the hospital for approximately 40 days. During that time, Sanchez maintained regular contact with appellant and his treatment team, and helped identify areas that were concerning to CONREP. When appellant was released from the hospital on November 8, 2010, Sanchez picked him up and transported him back to the same home in Fairfield where he was placed under level one supervision. Sanchez continued to act as his case manager.

In September 2011, Sanchez prepared an annual report of appellant's progress for CONREP. That report included the results of a July 2011 "HCR risk assessment" that Sanchez performed. This type of assessment looks at historical indicators, current or risk crimes, history of criminal behavior, and current clinical impressions in order to assess a level of risk that the subject would pose if returned to the community. The assessment of appellant indicated that his risk of violent reoffense was "moderate." Several factors contributed to this conclusion including his young age at the first violent incident,[4]

---

[4] According to the report, which is in the record, appellant killed his mother during a heated argument that occurred two days after appellant's 18th birthday.

employment problems, substance use problems, early maladjustment and, finally, his severe mental illness diagnosis of paranoid schizophrenia.

The September 2011 report also contained information about another violation of CONREP rules that occurred the previous month. When Sanchez conducted a home visit, appellant was with the same man Sanchez had found sleeping in appellant's room the year before. Not only was the visitor a convicted felon but he had previously threatened appellant's co-tenant with a gun. As a result of this incident, appellant was placed on "clinical probation." There were other compliance problems as well: missed meetings; failure to complete program assignments; failure to search for employment; staying up late; not eating properly; and using his grocery money to buy equipment for a video rap music business that he wanted to start.

In September 2011, Sanchez took a medical leave to have surgery and CONREP assigned another employee to act as appellant's case manager. After Sanchez returned to work at CONREP in December, he still had regular contact with appellant at group therapy sessions and other program meetings.

On June 1, 2012, Sanchez was tasked to help appellant move from his residence in Fairfield to an apartment in Vallejo. When Sanchez arrived, the apartment was very dirty and Sanchez noticed that the television and other items were missing. Sanchez also noticed a change in appellant's behavior. He paced back and forth, was more talkative than usual, appeared alert and vigilant and acted paranoid. Normally appellant was not forthcoming about anything, but that day he talked a lot about his co-tenant, another CONREP client, and about all the things that he had observed. He said his roommate was being evil, talking about evil things, and that other people were using drugs and coming in and out of the home. As Sanchez walked around the apartment, he noticed that appellant kept coming up right next to him. For the first time in his 27-year career, Sanchez felt concern for his safety. It occurred to him that he might have to fight for his life and he found himself making a plan for how to get out of the apartment. As it turned out, the move to Vallejo was postponed because appellant was not packed and ready to go, and Sanchez left without incident.

7

In July 2012, appellant's CONREP case manager conducted a home visit at appellant's new apartment in Vallejo. Sanchez accompanied his coworker because he was concerned for her safety. From the time appellant opened the door, his eyes fixed on Sanchez. Appellant had lost weight, had a foul odor, and had not showered. Sanchez made small talk as he tried to take a look around but appellant remained right next to him. Sanchez had that same fear for his personal safety that he experienced the previous month, although this time it was more intensified. Appellant was more volatile and appeared to be decompensating. Sanchez took a passive role in the visit because he was not the case manager, but he tried to subtly highlight concerns for his partner. He pointed out several crucifixes that were connected to form a string for activating a light that changed colors, and he asked about a safe where appellant was storing his deodorants. Appellant said he had the safe because he needed to protect his stuff. When Sanchez commented on a Bible that was on top of the safe, appellant talked about how he had been reading it and trying to cleanse himself.

Sanchez testified that he was very concerned about his personal safety after the July 2012 home visit. He had assumed the role of making and enforcing rules in appellant's life and it appeared that appellant perceived him the same way he had perceived his mother before the murder. After the visit, Sanchez shared his concerns with other CONREP employees.

A July 2012 report that appellant's case manager prepared on behalf of CONREP listed several concerns about that month's home visit, including that appellant had gotten rid of his refrigerator because it smelled and carried germs; that he disconnected the gas from his stove to "avoid chemicals;" that he had a strong body odor because he was trying to avoid using chemicals; and that he had a significant weight loss because he was not eating in order to avoid chemicals in food. During the July 2012 visit appellant had also expressed fear that CONREP staff would come into his apartment, tamper with his things and leave their germs. The report noted that appellant's fear of chemicals was similar to the fear of poisons he had at the time he killed his mother. The report also documented appellant's poor compliance with the general terms and conditions of his

8

independent living program. Efforts by CONREP personnel to intervene and find ways to support appellant were met with increasing resistance, agitation and anger.

After the July 2012 incident, CONREP recommended that appellant be taken into custody because he posed a danger to the safety of others. Sanchez testified that he was assigned to accompany law enforcement when appellant was taken into custody. That experience deepened Sanchez's concern that he had become the focus of appellant's attention.

Sanchez testified that, although appellant has remained in the hospital since July 2012, there have been periodic discussions at CONREP about returning him to the community. Sanchez has consistently opposed returning appellant to independent living. He believes appellant poses a risk to his personal safety. Sanchez also testified that he now realizes that appellant was never forthcoming or genuine in his interactions with Sanchez. Other people might find themselves in a similar situation, facing a real danger because they do not know what is really going on with appellant. In addition, Sanchez sees a dangerous pattern regarding appellant's behavior. Appellant would do better in custody, but would deteriorate when he was in the community and, each time he was released from a hospital stay, his behavior became more dangerous. Finally, Sanchez expressed concern for appellant's young daughter. During the period appellant was living in the community, Sanchez had worked with them to reunify. But, after his own experiences with appellant, Sanchez was concerned that appellant's daughter might not recognize a dangerous situation and become another victim.

At the conclusion of his hearing testimony, Sanchez offered the opinion that appellant represents a danger to the health and safety of others and that he should not be released. He acknowledged that other individuals involved in appellant's treatment disagree. However, Sanchez testified that he has had direct personal experiences with appellant that inform his opinion. During periods that appellant was living in the community under CONREP's supervision, Sanchez provided approximately 95 percent of the one-on-one contact with appellant and he testified that those types of contacts give him a perspective that other CONREP members do not have.

**B. Appellant's Evidence**

Dr. Kathleen O'Meara testified as an expert in the areas of psychology, risk assessment and mental health. To formulate her opinions for this case, O'Meara reviewed pertinent court and medical records, and CONREP reports. Then she interviewed appellant for five hours. Ultimately, O'Meara concluded that appellant was presently stable and not currently dangerous, although there were treatment issues to be addressed in order to maintain a non-dangerous status.

O'Meara opined that appellant's illness followed a pattern of deterioration which prevented him from "harbor[ing] any kind of generalized aggressive impulses." She also testified that her conclusion that appellant is "okay today" was greatly affected by the fact that he was presently medication compliant. O'Meara acknowledged she did have a concern about whether appellant's illness could be controlled through medication when he was outside the structured environment of a hospital. Nevertheless, O'Meara opined that "[a]s somebody who is not presently dangerous today," appellant qualified for release under section 1609.

O'Meara testified that appellant admitted he had experienced paranoia when dealing with CONREP staff in the past, but she believed that if appellant were to relapse it would not be a sudden occurrence but a progressive deterioration. O'Meara also reiterated that it would be very important for appellant to continue his medication in order to prevent him from reverting to paranoia which could result in extreme violence.

The trial court asked O'Meara if she believed appellant did not require hospital supervision because he could be appropriately supervised by an agency like CONREP. O'Meara offered this answer: "I think that based on the records I've seen, that the quality and depth of the therapy that he's able to get is better in Conrep than it is in the staffing, strapped, whatever their issues are in Napa, where they . . . seem to be addressing, in my opinion, superficial issues that don't get to the crux of what his problems are."

After O'Meara completed her testimony, two doctors from appellant's treatment team at Napa State Hospital testified on appellant's behalf. Dr. Amrid Saini, appellant's treating psychiatrist for six months, testified that appellant was not a danger to others and

10

was ready for release into the community. Saini also testified that appellant's treatment team agreed with his conclusion. Under cross-examination, Dr. Saini testified that he recognized Sanchez's name but he never spoke with Sanchez, and was not aware that Sanchez believed appellant was currently dangerous. Dr. Saini also acknowledged that a psychologist who was no longer a part of appellant's treatment team had expressed serious concerns about appellant's behavior as recently as October 2012.

Dr. Aton Bercovitch, a staff psychologist at Napa hospital, had been a member of appellant's treatment team since September 2012. Bercovitch testified that he had seen appellant make progress over time and that he believed appellant would not pose a risk in a supervised outpatient setting. Bercovitch recognized Sanchez's name but had never met him and was not familiar with the details of Sanchez's prior interactions with appellant aside from the fact that there had been some "general perspective" that appellant had become decompensated and needed to "be removed temporarily."

### C. The Trial Court's Ruling

At the conclusion of the hearing, the trial court found the prosecutor established "beyond a preponderance of the evidence" that appellant posed a risk to himself and the safety of others if he was not returned to the hospital. In reaching this conclusion the court relied on evidence that when appellant was on out-patient status, he was not compliant with his medication, exhibited irrational fears of being poisoned by chemicals, had at one point become emaciated due to his fear of chemicals in food, and was only marginally compliant with the other requirements of the program. The court also highlighted evidence that when appellant failed to comply with the program requirements he displayed paranoid behavior that was similar to his behavior in December 2001 when he killed his mother.

With regard to the other experts who testified, the court expressed some concern about the basis for Dr. O'Meara's opinion. It appeared to the court that O'Meara lacked confidence in the Napa State Hospital treatment program, opining that she "felt it's pretty weak." The court felt that this lack of confidence in Napa's program, when compared to the relatively better treatment O'Meara believed appellant would receive in an outpatient

11

setting, was one of the reasons she offered the opinion that he would not be dangerous if re-released into the community.[5] The court also found that Sanchez's interactions with appellant had been "far more thorough and meaningful" than the other witnesses who testified. Thus, the court concluded that Sanchez's testimony established "beyond a preponderance of the evidence" that appellant posed a risk to himself and the safety of others, and ordered his outpatient status be revoked.

## IV.

## DISCUSSION

"Section 1609 provides that if the prosecutor believes an outpatient poses a danger to public safety, the prosecutor may petition for a hearing on revocation of the patient's outpatient status, using the same standards as those used in conducting probation revocation hearings under section 1203.2. Probation revocation proceedings are not a part of a criminal prosecution, and the trial court has broad discretion in determining whether the probationer has violated probation. [Citation.] The standard of proof required is a preponderance of the evidence supporting revocation. [Citation.]" (*People v. DeGuzman* (1995) 33 Cal.App.4th 414, 419-420; see also *People v. Rodriguez* (1990) 51 Cal.3d 437, 442.)

Here, substantial evidence supports the trial court's order. As the CONREP representative who had the most direct contact with appellant, Sanchez was well-positioned to evaluate whether maintaining appellant's outpatient status posed a substantial danger to the safety of others. Sanchez was the only witness at the hearing who had any contact with appellant in an outpatient environment. For most of the time that appellant was on outpatient status, Sanchez was primarily responsible for his

---

[5] According to the reporter's transcript, the court made the following statement about O'Meara: ". . . I think she has a very limited competence in the Napa State Hospital treatment program." When this quoted remark is read in context, however, it is clear to us that what the court actually said or meant was that O'Meara had very little "confidence" in the hospital treatment program. We make this point for the record because we disagree with an assertion in appellant's brief that the trial court rejected O'Meara's expert opinion because it doubted her "competence."

12

treatment and supervision and, after Sanchez was no longer appellant's case manager, he remained actively involved in appellant's case. Sanchez's percipient testimony was supplemented and reinforced by his expert opinion that appellant poses a substantial risk of danger to the community. Thus, Sanchez's testimony constitutes substantial evidence supporting the revocation.

Appellant contends that Sanchez's testimony does not constitute substantial evidence because it was uncorroborated, stale and speculative. First, as a general rule, the testimony of a single witness may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.) Furthermore, Sanchez's percipient witness testimony was neither contested nor contradicted. The other witnesses at the hearing did not have any interactions with appellant when he was living as an outpatient, had never met Sanchez and were not familiar with the events that supported Sanchez's expert opinion that appellant is presently dangerous.

Second, Sanchez's testimony was not stale. Appellant argues that the court should have disregarded Sanchez's testimony because he did not have any interactions with appellant for several months prior to the section 1609 hearing, and thus was not in any position to evaluate whether appellant was *currently* dangerous. The question before the trial court was whether appellant's outpatient status should be revoked because appellant posed a danger to himself and others. (§ 1609.) Evidence of how appellant performed while he was actually on outpatient status, even if that contact ended some months earlier, was clearly relevant to that assessment. After all, Sanchez had virtually daily contact with appellant for more than two years, and was the only expert witness who engaged him in that environment.

Finally, Sanchez's testimony was predictive rather than speculative. Since appellant had been detained at the Napa State Hospital for a period of nine months prior to the section 1609 hearing, any expert opinion regarding his current dangerousness in an outpatient environment also had to be predictive. However, unlike the other experts who testified at the hearing, Sanchez's opinion was supported by direct observations of appellant's actual performance in the outpatient program. Thus, the trial court could

13

reasonably have concluded that Sanchez offered the least speculative opinion regarding whether appellant was currently dangerous in an outpatient setting.

Appellant contends that the trial court committed reversible error by "arbitrarily" ignoring, "without explanation," the recommendations of the doctors on appellant's treatment team who testified that he was not a danger, and that he was ready to be released to the community. According to appellant, a court may disregard an expert witness recommendation "only for non-arbitrary reasons." (Citing *People v. Cross* (2005) 127 Cal.App.4th 63, 73.) The trial court in this case did not ignore the opinions of appellant's doctors without explanation. The court was presented with conflicting expert opinions and made the reasoned decision to rely on the expert whose interactions with appellant were "far more thorough and meaningful" than the interactions described by the other witnesses who testified at the hearing.

Appellant insists that the order must be reversed because the "consensus opinion among the testifying experts established that appellant was not a danger to others and could appropriately remain on outpatient treatment." This argument does not comport with a substantial evidence standard of review. "A judgment will not be reversed based on an evaluation of the strength of the opposing evidence or the relative weakness of supporting evidence when compared to opposing evidence. It can be reversed based only on the absence or insubstantiality of supporting evidence, as determined from a review of all related evidence in the record. [Citation.]" (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 413, fn. & italics omitted.) Here, as explained above, Sanchez's detailed testimony and expert opinions constitute substantial evidence supporting the revocation order.

## IV.

## DISPOSITION

The order revoking appellant's outpatient status is affirmed.

14

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.


15