[No. A031482. First Dist., Div. One. Dec. 20, 1985.]

In re JAMES ARTHUR McPHERSON on Habeas Corpus.

COUNSEL

Peter F. Goldscheider for Petitioner.

John K. Van de Kamp, Attorney General, Linda Ludlow and Cynthia Coy Ong, Deputy Attorneys General, for Respondent.

OPINION

HOLMDAHL, J.—Petitioner contends, by petition for writ of habeas corpus, that his outpatient status was improperly revoked, so that he was illegally committed to the custody of the county director of mental health.

The petition is granted, in part.

*Background*

Petitioner James Arthur McPherson had been found not guilty by reason of insanity (Pen. Code, § 1026[1]) of a violation of then-section 217[2] (assault with intent to commit murder). That finding was made in 1977. On August 8, 1983, following a jury trial, his commitment was extended for two years. (§ 1026.5.) On June 29, 1984, he was released on outpatient status, pursuant to section 1604.[3]

On March 12, 1985, pursuant to section 1608, Lawrence P. Percell, Ph.D.,[4] wrote to the Presiding Justice, Criminal Division of the San Mateo County Superior Court, requesting that petitioner's outpatient status be revoked. As relevant here, the letter recited:

"On June 29, 1984, on the recommendation of Napa State Hospital and of me as Designee of the County Mental Health Director, the Court placed Mr. McPherson on outpatient status. He was discharged from Napa State Hospital on September 12, 1984 and went to live with his grandmother in San Mateo. He received his medication and psychotherapy at the Central County Mental Health Center in San Mateo and for several weeks participated in the County's vocational workshop in Belmont.

"On February 27, 1985 it was necessary for the patient's therapist, Dr. Allen Valcov, to place Mr. McPherson in Chope Hospital.[5] The patient

---

[1]Unless otherwise expressly noted, all statutory references are to the Penal Code. All court proceedings referred to occurred in the San Mateo County Superior Court.

[2]Section 217 was repealed by Statutes of 1980, chapter 300, section 2.

[3]Section 1604 provides:

"(a) Upon receipt by the committing court of the recommendation of the director of the state hospital or other treatment facility to which the person has been committed that the person may be eligible for outpatient status as set forth in subdivision (a) of Section 1603, the court shall immediately forward such recommendation to the county mental health director, prosecutor, and defense counsel.

"(b) Within 30 calendar days the county mental health director or a designee shall submit to the court and the director of the state hospital or other treatment facility, a recommendation regarding the defendant's eligibility for outpatient status, as set forth in subdivision (b) of Section 1603 and the recommended plan for outpatient supervision and treatment. The court shall provide copies of this report to the prosecutor and the defense counsel.

"(c) The court shall calendar the matter for hearing within 15 judicial days of the receipt of the county mental health director's report and shall give notice of the hearing date to the prosecutor, defense counsel, the county mental health director, and the director of the state hospital or other facility. The court shall, after a hearing in court, either approve or disapprove the recommendation for outpatient status. If the approval of the court is given, the defendant shall be placed on outpatient status subject to the terms and conditions specified by the court."

[4]Dr. Percell, as a member of the court's corrections health unit, is the designee of the mental health director with regard to certain "Penal Code patients."

[5]Section 1610 allows for summary revocation of outpatient status, which is the procedure by which petitioner was placed initially in Chope Hospital. He does not challenge that revocation.

had become overtly psychotic. He was making threats to kill President Reagan (and there is an active case with the Secret Service because of prior threats to the President), was paranoid, could not sleep and was pacing constantly. His grandmother also indicated at that time that she could no longer tolerate having him live with her. She alleged that he was using both alcohol and street drugs although she was rather non-specific about the latter. This was the second time since September that the patient and his grandmother had had a significant problem. By his own admission, the patient has been using alcohol occasionally, which is a violation of his outpatient contract.

"When I and his therapist at Chope Hospital informed Mr. McPherson last week that he would not be allowed to reside with his grandmother, the patient became extremely hostile, angry and made vailed [sic] threats to us. His primary therapist at Chope, Dr. Freeman Humphrey, and the treatment team are of the opinion that Mr. McPherson needs extended inpatient treatment at this time; and I concur. A referral was made to the Cordilleras Mental Health Center in Redwood City for such extended inpatient treatment; however, because of the patient's hostility, potential explosiveness and lack of desire to be admitted to the Cordilleras Center, the referral was denied yesterday. Consequently, the San Mateo County Mental Health system has no extended inpatient service for him."

*The Revocation Hearing*

A revocation hearing was held on April 10, 1985. Dr. Percell reiterated the contents of his letter regarding petitioner's behavior. Petitioner's attorney made a hearsay objection to the testimony, and moved to strike. The objection was overruled and motion denied.

Dr. Percell went on to add that, after petitioner's admittance to Chope Hospital, his anger and hostility warranted his transfer to a jail unit. The initial opinion that petitioner needed further inpatient treatment was based both on his reported behavior and on the fact that there was no suitable outpatient alternative for him. However, subsequent to his letter, Dr. Percell had altered his recommendation that petitioner be returned to Napa State Hospital because placement had in fact been arranged at Cordilleras Mental Health Center, an inpatient facility in San Mateo County. Dr. Percell noted that local inpatient treatment would be a feasible alternative until such time as a "suitable" outpatient facility could be found for petitioner.

Petitioner, according to Dr. Percell, had lived by himself in a rented room after leaving his grandmother; so doing was a technical violation of his outpatient contract. He was starting to drink again, which was also a vio-

lation of his outpatient contract. He was not taking his medication. He was becoming psychotic. On one occasion, while living alone, he called his counselor at a vocational workshop, asked how to cook chicken, and indicated that he had not eaten in several days. He had failed to appear at appointments in January and February with Dr. Valcov. Dr. Percell concluded that petitioner was beginning to act psychotic because of the letter making threats against the President.

Dr. Percell conceded, however, that he had no personal knowledge of the foregoing, but based his testimony on reports from Dr. Valcov. And, Dr. Percell conceded that Dr. Valcov's conclusions were not based on Dr. Valcov's personal observation.

Petitioner testified as well, indicating that his grandmother wished to have him return to her home. He explained that he had missed appointments with Dr. Valcov because he did not have money to catch the bus on one occasion, and, on another, because he had gone to the library and was thus late for the appointment. He admitted that he had had "a little wine and a couple of beers," but said he was not drinking heavily. He denied that he had been neglecting to eat when he asked his vocational counselor how to cook chicken; he said the house was full of food and he simply did not know how to prepare the chicken.

On the basis of the foregoing evidence, the trial court revoked petitioner's outpatient status, pursuant to section 1608.

### Statement of Issues

Petitioner contends that his commitment is illegal, because:

I. He was not provided with a list of the charges and allegations upon which his outpatient status was to be revoked, so that basic procedural due process guarantees were not afforded him.

II. The trial court utilized improper standards in revoking outpatient status, in that: (a) It failed to find that petitioner was a danger to himself or others; and (b) It failed to conduct a de novo hearing on the question of revocation.

III. There is no substantial evidence, in any event, to support the revocation.

### Discussion

*In re Anderson* (1977) 73 Cal.App.3d 38, 41 [140 Cal.Rptr. 546], answered affirmatively the question "whether the procedural due process prin-

ciples enunciated in *Morrissey* v. *Brewer,* 408 U.S. 471 . . . and in *In re Bye* [1974] 12 Cal.3d 96 [115 Cal.Rptr. 382, 524 P.2d 854] [cert. den., 420 U.S. 996 (43 L.Ed.2d 679, 95 S.Ct. 1437)] dictate that a mental patient acquitted by reason of insanity must be afforded notice and hearing prior to the revocation of his outpatient status." *Anderson* was decided when then-section 7375 of the Welfare and Institutions Code governed outpatient treatment of those acquitted on grounds of insanity. Notably, the section did not provide for a revocation hearing where recommitment was at the request of the physician.

The *Anderson* court rejected the People's attempt to distinguish a decision to recommit a mentally disturbed offender from a decision to revoke parole (*Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593]) or to revoke California Rehabilitation Center (CRC) outpatient status. (*In re Bye* (1974) 12 Cal.3d 96.) The court observed: "[T]he conditional liberty interest of the mental outpatient, like that of the parolee and the CRC outpatient, includes many of the core values of unqualified liberty and cannot be terminated without due process of law." (*In re Anderson, supra,* 73 Cal.App.3d 38, 43.) "Despite the conditions imposed upon him, the outpatient is able to form 'the other enduring attachments of normal life' [citations] and enjoys 'many of the core values of unqualified liberty' [citation]. The revocation of his status and recommitment to a state mental hospital—an institution which often is little more than 'a sanitary dungeon' [citation]—certainly works a loss of liberty as grievous as that inflicted upon his parolee and narcotic addict counterparts." (*Id.,* at p. 44.) Further, the *Anderson* court observed that "[¶] [t]o call the revocation of respondent's outpatient status a 'medical' as opposed to a 'factual' or 'adversary' decision, or to label his status as a 'continuing course of treatment' is simply a variation of the now discredited right-privilege distinction." (*Id.,* at p. 45.)

While *Anderson* found that a prerevocation in-community preliminary hearing is inappropriate under most circumstances, the court held that a committed person must, under due process principles, be afforded minimal notice and hearing requirements: "(1) prompt written notice of the charges and evidence against the patient justifying recommitment, and notice of the right to challenge the allegations at a full revocation hearing; (2) a revocation hearing held by a neutral hearing body, such as the Department of Health, in which the patient has the right to have the evidence against him disclosed, to confront and cross-examine witnesses, and to have a written statement by the fact finder as to the reasons for revoking his outpatient status." (*In re Anderson, supra,* 73 Cal.App.3d at pp. 47-48.) Further, such a hearing "must be held as soon as is reasonably possible following the patient's return to the hospital." (*Id.,* at p. 48.)

The Attorney General contends that we may disregard *Anderson* because the enactment of section 1600 et seq. have superseded the procedures which were included in former section 7375 of the Welfare and Institutions Code. The new statute, however, is virtually identical to the relevant portion of Welfare and Institutions Code section 7375, except that it now requires the very hearing mandated by *In re Anderson.* That the new statute provides for a judicial hearing, instead of the Department of Health hearing suggested by *Anderson,* does not negate *Anderson*'s analysis and conclusion that other minimal due process protections are also required.

With the *Anderson* principles in mind, we address petitioner's contentions.

## Procedural Due Process

Petitioner first contends that notice to him was inadequate. We disagree. Dr. Percell's letter stated the general facts warranting the revocation. The specific detail was legitimately a matter for the hearing. Petitioner fails to suggest in what way the notice could have been more specific beyond his complaint that the detail of what the mental health director sought to prove was not presented in a form that would permit petitioner adequately to prepare for the hearing. Plainly, however, the letter is sufficiently detailed to give petitioner notice of the conduct prompting the director's request.

## Standard for Revocation

Next, petitioner makes a two-pronged attack on the standards by which the trial court determined to revoke his outpatient status.

First, he says, the trial court failed to find that he was a danger to himself or to others. Petitioner concedes that the plain language of section 1608 does not specify such a standard; however, he dubs this a "legislative oversight," given that such a standard is specified in section 1609. He then argues that section 1608 contains no standard. Petitioner is wrong. Section 1609 governs recommitment proceedings initiated by the prosecution.[6] And, quite simply, section 1608 does contain criteria for revocation: (1) "the person requires extended inpatient treatment" or, (2) "refuses to accept further outpatient treatment and supervision . . . ." Likewise, petitioner's reliance on the danger-to-oneself-or-others standard of section 1611, subdivision (c)(1) is of no assistance to his argument. That section deals with *pre-hearing* commitment of *paroled* patients.[7] The trial court was required

---

[6]Formerly, these procedures were outlined in Welfare and Institutions Code section 7375.

[7]Similarly, see section 1610, involving prehearing commitment of outpatients.

only to find that petitioner required extended inpatient treatment or that he refused to accept further outpatient treatment and supervision.

■ Second, petitioner contends that the trial court erred by failing to conduct a de novo hearing, viewing its role, instead, as one of determining whether the outpatient supervisor's opinion was arbitrary and capricious. In doing so, the trial court wrongly relied on hearsay. The result, argues petitioner, was to deprive him of a full hearing on the merits of the revocation. We agree.

The *Anderson* court made clear that the requirements outlined by it were the "constitutional minima" (*In re Anderson, supra,* 73 Cal.App.3d 38, 43) to which a patient was entitled. Those requirements, we reiterate, include "a revocation hearing held by a neutral hearing body, such as the Department of Health, in which the patient has the right to have the evidence against him disclosed, to confront and cross-examine witnesses . . . ." (*Id.,* at pp. 47-48.) Welfare and Institutions Code section 7375, like current section 1609, provided for a full judicial hearing before revocation of outpatient status upon a prosecutor's complaint of dangerousness, at which standards used in conducting probation revocation hearings are to be applied. While the *Anderson* court suggested a Department of Health hearing for physician-initiated revocations, the Legislature has instead provided, in section 1608, for a judicial hearing. The lack of reference in section 1608 to use of probation revocation hearing standards (cf. former Welf. & Inst. Code, § 7375 and Pen. Code, § 1609) does not negate the constitutional requirements of confrontation, cross-examination, and a fact-finding hearing by a neutral body[8] applying a preponderance of the evidence standard of proof. (*People* v. *Maki* (1985) 39 Cal.3d 707, 711 [217 Cal.Rptr. 676, 704 P.2d 743].)

■ What is more, the California Supreme Court in *People* v. *Winson* (1981) 29 Cal.3d 711 [175 Cal.Rptr. 621, 631 P.2d 55], cert. den., 455 U.S. 975 [71 L.Ed.2d 688, 102 S.Ct. 1485], has made it plain that hearsay testimony is inadmissible at a revocation hearing, absent a showing of good cause. ■ Here, Dr. Percell had virtually no personal knowledge of specific instances of behavior by petitioner warranting recommitment. Further, nothing in the record suggests that Dr. Percell was offered as an expert witness within the meaning of Evidence Code sections 720-722; the propriety of petitioner's recommitment was not posed to Dr. Percell as a subject for opinion testimony (cf. Evid. Code, §§ 801 and 802); and no documen-

[8]The Legislature is presumed to have been aware of *In re Anderson* when it enacted the present statutory scheme. (*In re Jeanice D.* (1980) 28 Cal.3d 210, 216 [168 Cal.Rptr. 455, 617 P.2d 1087].)

tary evidence was offered to support the revocation request. (See Welf. & Inst. Code, § 5328, subd. (f).) ■ Nor does the statute itself provide any exception to the general rules of evidence regarding admission of hearsay evidence. (Cf. *Conservatorship of Manton* (1985) 39 Cal.3d 645 [217 Cal.Rptr. 253, 703 P.2d 1147].)

■ Nothing in the recent opinion *People v. Maki, supra,* 39 Cal.3d 707 changes our view. *Maki* involved the admissibility of *documentary* evidence at a probation revocation hearing when that evidence was not otherwise admissible under an exception to the hearsay rule. *(Id.,* at p. 709.) The documentary evidence was admissible, the *Maki* court concluded, because it involved "sufficient indicia of reliability." *(Ibid.) Maki* distinguished *People v. Winson, supra,* 29 Cal.3d 711, on the ground that *Winson* involved the limited question of the introduction of former testimony of the sole percipient witness, uncorroborated by any other evidence, accepted without a finding of the legal unavailability of the witness, and without a finding of good cause for denying the right to confront and cross-examine. *(People v. Maki, supra,* 39 Cal.3d at p. 714.)

While *Maki* itself appears to limit its holding to the use of documentary evidence, its analysis relies on cases in which other kinds of hearsay evidence were admitted. Of note here are two of those cases. In *Egerstaffer v. Israel* (7th Cir. 1984) 726 F.2d 1231, 1235, the circuit court approved use of the unsworn recorded interview of the victim, where that interview formed only part of the basis for revocation and where the interview was detailed, was substantially the same story that had been told by the victim to three other persons on different occasions, was corroborated in part by eyewitness testimony, and where the defendant had admitted many of the facts. In *Taylor v. United States Parole Com'n* (6th Cir. 1984) 734 F.2d 1152, however, the court refused to uphold a parole revocation based solely on a letter from an out-of-state probation officer. "A finding of criminal conduct based solely upon a probation officer's summary of an arrest report is but a step away from a finding of criminal conduct based solely upon evidence of a parolee's arrest with no account of the underlying circumstances." *(Id.,* at pp. 1155-1156, fn. omitted.)

Plainly, even under the liberal view of hearsay admissibility expressed in *Maki,* petitioner's hearing does not meet constitutional standards. Dr. Percell's testimony was quite similar to the letter condemned in *Taylor.* The only other evidence at the hearing was petitioner's testimony which did not corroborate the broad generalizations made by Dr. Percell.

### Substantial Evidence

■ Finally, contends petitioner, assuming arguendo the trial court proceedings were a de novo hearing, there was not substantial evidence to

support the revocation because of the hearsay nature of Dr. Percell's testimony and because Percell had not established that there were no outpatient alternatives available for petitioner. We agree. As we have observed, Dr. Percell's testimony concerning petitioner's condition was admitted over proper hearsay objection. His conclusions concerning the lack of a suitable outpatient facility for petitioner were based on this hearsay testimony.

## Conclusion

We conclude, therefore, that petitioner is entitled to a new hearing on the question of whether his outpatient status should be revoked, consistent with the principles expressed herein. This holding does not, however, require petitioner's release from outpatient status at this time. The facts described by Dr. Percell, if established by admissible evidence, would warrant revocation of petitioner's outpatient status under a preponderance of the evidence test.

Therefore, the petition for writ of habeas corpus is granted to the extent that the April 10, 1985, order of the San Mateo County Superior Court in No. C-6441 revoking petitioner's outpatient status is set aside. The San Mateo County Superior Court shall hold a new revocation hearing within 15 judicial days of the finality of this opinion. In all other respects, the petition is denied.

Racanelli, P. J., and Elkington, J., concurred.