Filed 7/24/14  P. v. D.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058640 |
| v. | (Super.Ct.No. FELSS1103171) |
| D.W., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Katrina West, Judge.  Affirmed.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant D.W., a Mentally Disordered Offender (MDO), appeals from an order revoking his outpatient status under Penal Code section 1608.[1]  He contends the mandatory statutory procedures outlined in sections 1608 and 1610 were not followed, and his statutory and due process rights were violated when the trial court allowed the admission of unlimited hearsay.  Rejecting his contentions, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

Defendant was committed and admitted to Atascadero State Hospital on November 2, 2003, after being certified as an MDO, parolee, pursuant to section 2962. He was administratively transferred to Patton State Hospital (Patton) on June 7, 2005, and his legal status was converted to MDO, former parolee, on November 2, 2006, pursuant to section 2972.  His controlling crime was a violation of section 4501.5, battery on a nonprisoner.

Prior to August 31, 2012, the San Bernardino County District Attorney petitioned the court pursuant to section 2970 to establish that defendant met the criteria of an MDO. On August 31, 2012, defendant withdrew his opposition to the petition and agreed to proceed with a placement hearing.  As a result of the hearing, the trial court ordered that defendant receive community outpatient treatment via the Gateways Conditional Release Program (CONREP).[2]  In preparation for this placement, CONREP met with defendant to

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  CONREP is "an involuntary treatment program created by the Legislature and includes requirements for treatment and supervision."  (*People v. DeGuzman* (1995) 33 Cal.App.4th 414, 416.)

have him sign the terms and conditions of outpatient treatment and to assess his current functioning for purposes of developing a treatment plan. Following the meeting, Dr. Nicole Paglione, psychologist, submitted a letter to the trial court dated September 28, 2012, opining that defendant required the level of care offered at a state hospital; nonetheless, CONREP continued complying with the court's order to place defendant in outpatient treatment.

Following delays in receiving the necessary documentation to facilitate the transfer from Patton to CONREP, Dr. Paglione sent another letter to the court dated January 3, 2013, informing the judge about defendant's "serious decompensation" and her request that the court rescind its placement order. On January 24, 2013, the trial court held a hearing pursuant to sections 2966 and 2970. After hearing the testimonies of three doctors, the trial court found "no specific accounts of violent behavior, or any destruction of property. The hallucinations have not been violent in nature . . . ." The court ordered defendant released to CONREP "in the community outpatien[t] treatment program IMMEDIATELY . . . ."

On April 2, 2013, Drs. Daniel J. Lance, forensic clinician, and Wendy A. Hatcher, Psychologist, along with Dr. Daniel Sussman, Program Director, filed a letter with the court entitled "Notification of Rehospitalization." In the letter, Dr. Sussman notified the court under sections 1608 and 1610 that defendant had been rehospitalized on that date "due to psychiatric decompensation, behavioral instability, and non-compliance with program rules and the terms and conditions of outpatient treatment." Dr. Sussman further stated CONREP was "seeking a revocation of [defendant's] outpatient status," and that it

3

would also submit a more detailed report regarding the circumstances leading up to the rehospitalization. The detailed report was submitted via an April 10, 2013, letter entitled "Request for Revocation of Outpatient Status."

On April 22, 2013, the trial court held an evidentiary hearing. After listening to the testimonies of the various experts, the court found that defendant had violated the terms and conditions of his outpatient program and that he could not be safely and effectively treated in the community, and ordered the outpatient treatment program revoked under section 1608. Defendant appeals.

## II. DISCUSSION

### A. Statutory Procedures for Revocation of Outpatient Treatment

Defendant contends that CONREP's failure to comply with the statutory requirements of sections 1608 and 1610 resulted in his illegal hospitalization for eight days and his counsel being deprived of "a full opportunity to prepare for the hearing." Noting that "no specific remedy for this violation of [his] rights is provided by the statute," defendant "suggests . . . that the appropriate remedy is the reversal of the judgment of the trial court and an order placing [him] back into the conditional release program."

Section 1608 provides, in relevant part: "If at any time during the outpatient period, the outpatient treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court in either the county which approved outpatient status or in the county where outpatient treatment is

4

being provided of such opinion by means of a written request for revocation of outpatient status. . . . [¶] Within 15 judicial days, the court where the request was filed shall hold a hearing and shall either approve or disapprove the request for revocation of outpatient status. If the court approves the request for revocation, the court shall order that the person be confined in a state hospital or other treatment facility approved by the community program director. . . ."

Section 1610, in relevant part, provides: "(a) Upon the filing of a request for revocation under Section 1608 . . . and pending the court's decision on revocation, the person subject to revocation may be confined in a facility designated by the community program director when it is the opinion of that director that the person will now be a danger to self or to another while on outpatient status and that to delay confinement until the revocation hearing would pose an imminent risk of harm to the person or to another. . . ."

Here, on April 2, 2013, CONREP submitted a letter to the court, notifying it pursuant to sections 1608 and 1610 that defendant had been rehospitalized on that date "due to psychiatric decompensation, behavioral instability, and non-compliance with program rules and the terms and conditions of outpatient treatment." The letter informed the court that CONREP was seeking revocation of defendant's outpatient status and that a full report regarding the circumstances of defendant's rehospitalization would be provided forthwith. On April 10, 2013, CONREP sent a letter entitled "REQUEST FOR REVOCATION OF OUTPATIENT STATUS."

5

On April 19, 2013, defendant's counsel objected to the "late filing of the request for revocation" on the grounds he was "having to try to be ready in a short time." Given the April 2 controlling date, the trial court set a hearing on April 22, within the 15 judicial days as required by section 1608. On April 22, defense counsel again objected on grounds of insufficient notice. In response, the prosecutor noted that the statute required a hearing date no later than April 22 unless defendant waived time. Thus, she stated that "if counsel feels unprepared, he can always waive time on behalf of his client." Defense counsel replied: "Well, I believe I'm sufficiently prepared to question Dr. Lance. The only issue that may occur is whether or not we need Dr. Reddy to testify . . . with regard to the medication that [defendant] was prescribed prior to his release from Patton. I don't believe we'll need him based upon what I anticipate will come from the witnesses here today. . . . But we may have to . . . request a brief continuation in the hearing so that we can have Dr. Reddy available." The court confirmed that defense counsel was not asking for additional time, but objecting because he should have had more notice. Defendant's primary complaint was that CONREP waited eight days while he was at Patton before submitting the letter outlining the circumstances supporting revocation of his outpatient status.

On appeal, defendant argues that the April 2 letter failed to qualify as a request for revocation pursuant to section 1608. However, he offers no legal authority to support his argument. We turn to the language in the statute, which provides that a program director is only required to notify the court in writing of its "opinion that [defendant] requires

6

extended inpatient treatment or refuses to accept further outpatient treatment and supervision." (§ 1608.) The April 2 letter complied with the statutory requirements.

Regarding defendant's claim that his counsel was "deprived" of the ability to fully prepare for the revocation hearing because he did not receive any paperwork until April 17, we note the record shows that counsel was aware that defendant had been rehospitalized as early as April 13, and he was given, but refused, the opportunity to continue the hearing to allow for more time to prepare. Further, counsel represented that he was sufficiently prepared and was not asking for more time. In fact, defense counsel specifically discussed the opportunity to continue the hearing with defendant and confirmed that they were "not asking for a continuance." Defense counsel represented that the only potential issue was that he may need to call a witness who had not yet been subpoenaed, and thus, a brief, partial continuance may be necessary. The court expressed its willingness to accommodate any request for a brief continuance. Given the record before this court, there is no evidence that would support a finding that defendant suffered from the court setting a hearing date on April 22, 2013.

Notwithstanding the above, defendant disputes the meaning of the April 2, 2013, letter. He submits it should be "interpreted as being exactly what it says it is, a 'Notification for Rehospitalization.'" Thus, he argues that CONREP's request for revocation of outpatient status was not made until April 10, 2013. Assuming defendant's argument is correct, we are at a loss as to his complaint. As the People aptly point out, section 1608 does not provide a minimum notice period before which a hearing can be held. Instead, it specifies the maximum amount of time that can pass before a hearing is

7

held. This maximum timeline serves to protect the individual's liberty interests so that he or she is not unduly confined without a proper showing by the state. Whether we use the April 2 or the April 10 date as the starting date, defendant's revocation hearing was held within 15 judicial days of either date.

To the extent defendant contends CONREP lacked the authority to transfer him back to Patton on April 2, pending its April 10 letter requesting revocation of outpatient status, he has not provided, nor have we found, any requirement that CONREP continue to maintain defendant in outpatient treatment pending the conclusion of the revocation hearing.

## B. Violation of Due Process Rights by Admission of Hearsay Evidence

Defendant contends his statutory and due process rights were violated when the trial court erroneously admitted "unlimited hearsay" during the hearing. He claims that, without the hearsay evidence, there was insufficient evidence to support the court's decision. Defendant acknowledges that his trial counsel did not object to each item of hearsay; however, he argues (1) based upon the trial court's rulings, repeated objections would have been futile, and/or (2) the failure to object constituted ineffective assistance of counsel.

We begin by reviewing the evidence admitted at the hearing. Dr. Daniel Lance, defendant's primary therapist at CONREP, testified. The doctor began treating defendant on February 20, 2013. He was being treated for "schizoaffective disorder, bipolar type." Dr. Lance testified that on September 14, 2012, defendant had signed the terms and conditions of outpatient treatment, and on November 7, 2012, he signed an addendum to

8

the document.  Dr. Paglione, defendant's forensic evaluator, informed Dr. Lance that she was present when defendant signed the terms and conditions and that she had discussed them with defendant, who understood them.

Dr. Lance wrote the April 10, 2013, letter.  He explained that defendant's outpatient status was revoked due to noncompliance with the terms and conditions, as well as an increase in psychiatric symptoms and behaviors.  Specifically, defendant violated Other Individual Terms and Conditions No. 2, that he take all of his prescribed medications; No. 3, that he comply with procedures, including mouth checks and blood draws; No. 5, that he refrain from engaging in acts of self-harm, such as swallowing foreign objects, refusing multiple consecutive meals, head banging and other suicidal gestures; and No. 10, that he immediately report to staff any worsening of his mental illness, including auditory hallucinations, feelings of panic, anxiety, restlessness, inability to sleep, appetite or mood disturbances, delusional thinking, and agitation.

Defendant began violating the terms and conditions within a few days of arriving at CONREP.  Regarding condition No. 2, Dr. Lance testified that at his initial meeting with defendant, defendant indicated he had some anxiety for which he was prescribed Celexa; however, he refused to take it.  Within a week of arriving at CONREP, defendant became noncompliant with his medications.  Regarding condition No. 5, Dr. Lance observed or was informed by staff that defendant refused meals for three days and threw away entire plates of food on multiple occasions; that he frequently did not drink or finish his Ensure, a supplemental nutrition drink prescribed; and that he took full Ensure bottles to his room, which were found during a room search.  Dr. Lance had explained to

9

defendant the importance of complying with the rules regarding his meals and of complying with the terms and conditions of his treatment.

Regarding condition No. 10, because defendant's record showed that he had a history of having auditory hallucinations, he was to report any hallucinations. Staff reported that defendant was talking to himself on at least three occasions; however, when Dr. Lance asked defendant about this, he denied it. Staff also reported that defendant was restless, clenched his fists, and paced while he was talking to himself. Dr. Lance explained that when a person speaks to himself, it is indicative of responding to internal stimuli such as auditory or visual hallucinations, and the clenching of fists indicates anger. Defendant did not sleep the night of April 1; he did not report it, and when asked about it, he said it was not an issue.

Defendant had numerous gastrointestinal complaints, which Dr. Lance opined were delusions. He based his opinion on reports from Patton that indicated multiple physical assessments had been completed and no medical issue had been found. Dr. Lance personally observed defendant's preoccupation with his gastrointestinal issues and believed defendant's thought process was substantially impaired by the delusions.

Although defendant began violating his terms and conditions soon after his transfer to CONREP, CONREP did not seek revocation of his treatment status immediately because they wanted to help him become compliant. In Dr. Lance's opinion, when defendant was returned to Patton it was because he represented a substantial danger of physical harm to others due to his severe mental disorder. The basis of his opinion was defendant's continued noncompliance with the terms and conditions of

10

his treatment, the active symptoms of his mental disorder, his refusal to eat certain meals, his breaking minor rules, and his interactions with staff. According to Dr. Lance, defendant's refusal to take his medication would likely lead to decompensation, which would exacerbate symptoms such as delusions and hallucinations, which could lead to acting out violently. Further, defendant's anxiety, if untreated, could cause him to become agitated, making him more likely to act out against others.

The court questioned Dr. Lance about his report. Dr. Lance testified that he saw contraband, consisting of a large garbage bag full of food, in defendant's room. This violated condition No. 5, which required defendant to eat his meals, and it violated "additional house rules" because it is a health hazard and "against CCL licensing" for patients to have food in their rooms. Defendant was told, both before and after the violation, that it was a violation to store food in his room. Defendant was caught on multiple occasions saying that he was going to call 911. On one occasion Dr. Lance was present. Defendant's reason for wanting to call 911 was to talk to his father about his gastrointestinal problems. Dr. Lance was concerned because of how quickly defendant became angry and agitated when asked questions. Dr. Lance opined that based on his own conversations with defendant, as well as those reported by defendant's treating psychiatrist, "it seemed as if [defendant] does not have insight as far as his mental illness [is concerned]." This made treatment difficult because defendant would fixate on issues, such as being unjustly medicated, and would deny other problems the staff discussed with him.

11

At the conclusion of the hearing, the court approved the request for revocation. In reaching its decision, the court explained that: (1) it was "very familiar" with defendant, having presided over the multiple-day trial that resulted in defendant's release to CONREP; (2) it was concerned that defendant was "clenching his fists [and] yelling at staff"; (3) it was concerned that defendant was difficult to redirect and was fixated on "imagined somatic symptoms" to the point that he was agitated and wanted to call 911; (4) it was concerned that defendant was hording food in his room while refusing to eat or drink his Ensure; and (5) it was concerned about his refusal to take his mood-stabilizing medication, along with his failure to report hallucinations and sleep disturbances. The court noted that in a short period of time defendant had violated, on multiple occasions, a significant number of terms and conditions of his outpatient treatment. Because the situation was not merely a violation of one term, the court approved the request for revocation.

Before an individual's outpatient status may be revoked pursuant to section 1608, the prosecution must prove, by a preponderance of the evidence, that the individual requires (1) extended inpatient treatment, or (2) refuses to accept further outpatient treatment and supervision. (§ 1608; *People v. DeGuzman*, *supra*, 33 Cal.App.4th at p. 419.) The trial court's broad discretion to revoke the outpatient status of a committed acquittee will be upheld absent an abuse of discretion (*People v. Henderson* (1986) 187 Cal.App.3d 1263, 1267-1268); on review, the revocation order will be reversed only if not supported by substantial evidence. (*In re McPherson* (1985) 176 Cal.App.3d 332, 341-342.)

12

Defendant primarily faults the trial court for admitting and relying upon hearsay evidence. The contention is meritless. The sole witness to testify at the hearing was Dr. Lance, who provided his expert opinion regarding the need to revoke defendant's outpatient status. "A witness testifying in the form of an opinion may state on direct examination the reasons for his opinion and the matter . . . upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.) Also, an expert witness may rely on competent hearsay as the basis for an opinion, so long as it is "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates . . . ." (Evid. Code, § 801, subd. (b); see *People v. Arias* (1996) 13 Cal.4th 92, 184.) Thus, there is no error in permitting an expert to describe the basis for his or her opinion, even if it entails placing otherwise inadmissible hearsay on the record. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-619[3]; *Arias*, *supra*, at p. 184.)

Moreover, in this case, Dr. Lance had the opportunity to interact with and evaluate defendant personally. The doctor testified that he had been working with defendant since his arrival at CONREP, and he was familiar with defendant's case history and record.

---

[3] "Expert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] . . . . [¶] So long as [the] threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his [or her] opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.]" (*People v. Gardeley*, *supra*, 14 Cal.4th at pp. 618-619.)

This is not a case where the expert on whose testimony the trial court based its determination had no personal knowledge of the defendant's behavior, history and condition. (Cf. *In re McPherson*, *supra*, 176 Cal.App.3d at pp. 340-341 [outpatient revocation order reversed, where trial court wrongly failed to conduct de novo hearing and relied on hearsay testimony of doctor who had virtually no personal knowledge of defendant's behavior in applying abuse of discretion standard to outpatient supervisor's opinion regarding defendant's treatment needs].)

We reject defendant's challenge to the court's admission of hearsay evidence and conclude there was no violation of his statutory or due process rights. Accordingly, defendant's claim that his counsel was ineffective is moot. Furthermore, we conclude that substantial evidence supports the court's decision to revoke defendant's outpatient status.

## III. DISPOSITION

The order revoking defendant's outpatient status is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

RICHLI
J.

14