Filed 9/23/14  P. v. Valencia CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD GILBERT VALENCIA III,<br><br>    Defendant and Appellant. | B250598<br><br>(Los Angeles County<br>Super. Ct. No. KA041527) |

APPEAL from an order of the Superior Court of Los Angeles County, Tia G. Fisher, Judge.  Affirmed.

Paul R. Kraus, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David Glassman, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Edward Gilbert Valencia III appeals from the trial court's order revoking his outpatient commitment under Penal Code section 1608[1] and returning him to a state mental hospital, arguing that the court's failure to conduct a hearing within 15 days violated his right to due process, and the revocation was not supported by substantial evidence. We affirm.

## BACKGROUND

As described at the preliminary hearing, on July 24, 1998, a West Covina bookstore employee saw Valencia pouring what smelled like gasoline over a book display; Valencia told her, "'I've just got to do that,'" lit the gasoline, and ran out of the store. A fire marshal who examined the scene testified that the cause of the fire was arson. On August 13, 1998, at a Best Western Hotel in West Covina, two hotel guests reported a smell of gas and smoke on the third floor, and the fire alarm system activated. The fire department put out a fire in room 309, which Valencia had rented for the night with cash. A red plastic container similar to a gasoline can was in the bathroom, and a television set, dresser, carpet and bedding were burned. A fire department captain concluded that three or four separate fires had been set in the room. Also on August 13, the manager of a Lucky supermarket heard a clerk yelling that some man was setting the store on fire. The manager ran down an aisle and saw flames at the end, and saw Valencia with charcoal lighter fluid in his hand, squirting the paper towels. He yelled, "'What the hell are you doing?'" and Valencia pulled a baseball bat out of a duffel bag and started swinging. Valencia left the store with several people chasing him. He swung the bat at the manager and a security guard, hitting the security guard several times. Valencia also hit a customer who had also given chase. When Valencia was arrested and read his rights, he admitted setting the three fires and said he was a "rebel" and the CIA and FBI were putting chemicals in his air.

In May 1999, a five-count indictment charged Valencia with three counts of arson in violation of section 451, subdivision (b), and two counts of assault with a deadly

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

weapon in violation of section 245, subdivision (a)(1). Valencia pleaded not guilty. Valencia's defense attorney declared his doubt as to Valencia's mental competence, and after Valencia waived jury trial, the court found he was not presently mentally competent to stand trial. After Valencia spent a period of commitment in a state mental hospital, a certification of mental competency was issued in October 2000. The trial court found Valencia competent to stand trial, and resumed criminal proceedings. Valencia withdrew his not guilty plea, and entered pleas of guilty to all five counts and not guilty by reason of insanity. The trial court accepted Valencia's guilty plea, and following a court trial submitted on the reports of two psychiatrists, found Valencia not guilty by reason of insanity, committing Valencia to Patton State Hospital on June 22, 2001 for a maximum confinement time of 13 years and four months, with custody credit. Valencia was transferred to a community outpatient treatment facility in 2004, and in 2006 he was reassigned to a less-restrictive, nonresidential forensic community treatment program (FCTP).

On January 28, 2013, a two-page "Notification of Rehospitalization" from the FCTP and signed by psychologist Katie Weilbacher and the program coordinator, notified the trial court that on that date Valencia had been rehospitalized at the state mental hospital after he violated his terms and conditions and the rules and regulations of the residential facility. The FCTP was preparing a report of the circumstances leading up to rehospitalization, believing revocation of Valencia's outpatient status was in order.

**Request for Revocation**

Dated February 1, 2013, a nine-page "Request for Revocation of Outpatient Status," signed by Dr. Weilbacher and the program coordinator and submitted to the trial court as a report to supplement the January 28 rehospitalization letter, stated that Valencia was not honest and forthcoming, was noncompliant with the interventions meant to keep him and the community safe, and continuously broke rules and regulations. Specifically, in November 2012 while living independently with his girlfriend, Valencia was notified by social security that it had overpaid him and he owed the agency $18,000. He turned to FCTP for help and told them he wanted to lie about the amount of money he

had and the amount of his bills. He said that he wanted to report he paid more in rent than he actually did and planned to have a bank account in his daughter's name to hide money. His checking account and bank statements showed that he had spent $5,000 from a social security back-payment in 25 days without accounting for the expenditures, and made multiple cash withdrawals from different ATM's, including five $20 withdrawals at different ATM's in one day for fast food. He denied stress or financial problems, but his girlfriend reported that he had been increasingly angry and stressed, and had threatened her once that his family would "'do something to her,'" although she considered this a "'play threat'" and he did not have much contact with his family. He showed "paranoid ideation" about the government. He had not been contributing to bills and became agitated when the subject of money arose. She was very worried about reporting this information because she feared Valencia would get upset. When confronted on these issues, Valencia denied any problems.

Valencia was moved to a more structured residence in December 2012 because of concerns with his relatively unstable behavior, and continued to receive treatment at FCTP. He continued to struggle. Staff reported that they were "unclear about his work times, his travel times, or who he may have been getting rides from." Although he said he rode with a female supervisor, staff reported a man picking him up once. Valencia was overheard telling someone on the phone he was going to get a pass for church but did not intend to use it for that purpose, later denying he said that. Stricter monitoring was put in place including restriction of passes and verifying that he actually went to work when he left the facility, requiring considerable resources like those necessary for a new admission.

In mid-January 2013,Valencia was reported to have gambled over football (a rule violation) and lost a pair of shoes. He admitted to giving away a sweatshirt, another rule violation, although he claimed a staff member "shrugged" when Valencia asked for approval.

In treatment, Valencia engaged in "defensiveness and distortions suited to meet his needs" and did not appreciate the importance of working with staff, or his own role in

4

requiring more care. At a special staffing meeting where he was approached about the issues with his behavior and treatment, he was instructed to resign from his part-time work to concentrate on treatment and make it easier to monitor him.

On January 25, 2013 at 10:40 p.m., the on-call therapist received notice that Valencia could not be found although staff had paged him for 45 minutes and thoroughly searched the premises. The Los Angeles Police Department was notified. At 11:55 p.m., Valencia was found in his bed. He claimed he was in the restroom, although staff had checked the restroom multiple times. He was rehospitalized on January 28, 2013.

The request for revocation sought "a revocation of his outpatient status pursuant to [section] 1608 to allow for an extended stay in the state hospital to address the concerns that led to his rehospitalization."

**Subsequent court orders**

On February 7, 2013, pursuant to an oral request of the public defender, a judge set a hearing on the revocation request for February 25, 2013, with a representative from the FCTP to accompany Valencia to court; the minute order was forwarded to the FCTP.

On February 15, 2013, with no parties or counsel present, Judge Tia G. Fisher stated that pursuant to a February 4 letter from the state hospital, Valencia was ordered transported to court from the state hospital on February 25 for a section 1608 hearing; the minute order was forwarded to the state hospital.

On February 22, 2013, pursuant to a telephonic request by the Los Angeles County Sheriff's Department, a different judge continued the hearing date to February 28, 2013.

On February 28, 2013, with the agreement of Valencia's counsel, another judge set the hearing for March 14, 2013, and ordered Valencia to be brought to court on that date.

**March 14, 2013 hearing**

When the March 14, 2013 hearing began, Dr. Weilbacher was present to testify, but Valencia had not arrived. Valencia's counsel requested a continuance so she could subpoena witnesses. The trial court expressed its concern stating, "your client is not here

5

and there's a witness here and hearing set and I know the hearing is supposed to be in 15 days and you prove it or not. . . . The findings or what needs to be said didn't happen because there was a request to put it over, I believe, on your behalf so you could evaluate it." At the February 28 hearing (before a different judge) "you were here on [Valencia's] behalf and your request was to put it over to transport him out for the hearing on today's date. . . . [¶] My assumption in reading that, since you were there, is that was okay with you." Counsel replied, "Yeah, I was going to be okay because I couldn't proceed without a client." The court continued, ""[S]tatutorily it simply says 15-day hearing. . . . I think we need to deal with it today. It was set today. You are present. There was a request made however it happened, and at least hear it out even if it's just preliminarily. . . . [¶] Doesn't mean that you can't turn right around a file a petition to have him back out again and have a full-blown hearing as to whether or not outpatient status is more appropriate than inpatient status." Valencia was on his way, and "regardless of how it plays out, it's my view I need to make some kind of ruling or at least clarify today." The court saw the procedure under section 1608 as requiring the court, once it received a letter notifying it of the revocation of outpatient status, "15 days, approve or disapprove . . . . Because that's why that issue has to be dealt with today . . . [¶] . . . [¶] because of my concerns with the timeline."

The March 14, 2013 hearing reconvened in the afternoon when Valencia arrived in court, and the court stated it was ready to proceed with a hearing under section 1608. Although the prosecutor was ready to proceed, Valencia's counsel said she was not: "The last time we were here today's date was scheduled. I did agree. I thought it was sufficient. But in hindsight after contacting a variety of different witnesses that would be coming in to testify regarding the rules violations in the [February 1] letter . . . , it wouldn't be sufficient time for service of process," and Valencia wanted her to prepare his defense with witnesses who would testify that he did not violate the rules. The court repeated its "concern pertaining to the time frame on the [section] 1608. . . . [T]he statute sets forth a very strict timeline." The court considered the January 28 letter not a formal filing or a request for revocation, but simply a notification of what had occurred

that did not trigger the setting of a hearing; the February 1, 2013 letter was the request for revocation requiring the court to take action.

Judge Fisher had been on vacation from January 25 to February 13. In her absence another judge on February 7 had set the hearing for February 25, in apparent response to a third letter dated February 4 and file-stamped February 6. That letter reminded the court that Valencia had been rehospitalized, inquired whether a section 1608 hearing to approve or disapprove the rehospitalization had taken place within the 15-day period, and requested the minute order of the hearing. When Judge Fisher returned from vacation, on February 15, she had the February 4 letter, and ordered Valencia brought to court on the February 25 hearing date set by the other judge. The February 7 minute order had been sent to the FCTP, not to the hospital, creating a transport issue.

The trial court believed the court had been diligent and the hospital had followed through, and its concern now was "timing issues," so that the hearing could be done in 15 days from the request. Counsel for Valencia replied, "That's gone." The court responded that it disagreed. The other judge had set the February 25 hearing date with the consent of the public defender. On February 22, another judge had moved the hearing to February 28 after a telephone request from the sheriff's department for a written removal order. On February 28, yet another judge had set the hearing for March 14, with Valencia's counsel agreeing, and issued another written removal order for that date. Now Valencia's counsel wanted to put the hearing over for more witnesses to address factual issues: "There's just no way in the world that's ever going to happen in a 15-day period in the court's view. . . . It's not going to happen. Would you concur with that?" Valencia's counsel stated, "I agree."

The court stated it would make a summary ruling that day especially given that the hospital was requesting it. There had not been one "because the process takes time and the removal orders and the lawyers, et cetera . . . court, lawyers, process, procedure." Counsel for Valencia stated that she had only the February 1 report, and the court had a copy of the January 28 letter made for her. Counsel then stated she had nothing further

7

other than scheduling a date for the appearance of witnesses. The court again stated that the 15-day period requirement required a hearing by the court to evaluate whether the treatment team had properly determined that rehospitalization was necessary to "evaluat[e] . . . an action taken where a person has lost their liberty." Counsel responded, "that's not a hearing," and the court replied, "I know it's not," but after a rehospitalization and within the 15-day period, the judge needed to determine only whether it approved or disapproved the request for revocation in a "summary evaluation . . . not a full-blown hearing" regarding treatment options. Counsel then asked if within the 15 days, Valencia had the right to subpoena witnesses from the specific examples in the rehospitalization report. The court replied no, "because how do you get witnesses subpoenaed within that many days?" The court was now dealing with legal issues, and asked counsel whether Valencia should be released, and counsel replied that he should be returned to the FCTP, but "not until after the hearing." The court asked whether Valencia "is waiving any defect by way of the 15 days," and counsel responded, "I don't know enough about it to inform him of that." The court repeated that it was "trying to deal with these legal issues and ensure the process is being respected though a van is waiting . . . to take [Valencia] back to the hospital."

The prosecutor submitted on the January 28 letter and the February 1 report "regarding the court's decision or the foundation upon which the court could decide whether to approve or disapprove of revocation."

The court again asked Valencia's counsel if Valencia would oppose a summary approval pending a full hearing, "because I think I need to make some determination at least summarily because of the statute," to give the hospital a timely judicial determination. The court would make an initial ruling pursuant to section 1608 pending a hearing to approve the hospitalization "without any prejudice to any hearing rights on this issue." The prosecutor advised the court that the author of the rehospitalization documents was present and "willing to answer questions by the court or propounded by counsel regarding this summary proceeding."

8

Valencia conferred with his counsel. The court clarified that he was to tell his counsel whether "it's fine to at least summarily approve the rehospitalization pending a hearing and allow the court to summarily make a finding based on the documents to approve it under [section] 1608 without any prejudice to your due process rights to have a hearing." Counsel stated, "He'll agree," and the court again addressed Valencia: "Is it agreeable with you summarily on the paperwork to approve the rehospitalization without any prejudice to your hearing on the issues relative to the public safety and treatment issue within the meaning of [section] 1608 which is where the court has to review it within a certain time limit? [¶] My view at this point there needs to be a ruling because of the time limit, but that's without any prejudice to any due process rights that you have to have a hearing on the actual merits of whether or not you present a danger to the health and safety of others while on outpatient status. That's the same standard as a [section] 1602/1603." Valencia stated, "I guess so," and counsel joined. The court summarily approved the revocation of outpatient status under section 1608, acknowledging "we are actually beyond the 15 days." The court then asked counsel if she was requesting a hearing, and how much time she needed; counsel responded, "yes" and requested April 11, 2013. The court set the hearing for that date and ordered Dr. Weilbacher to return. The minute order states that "the court preliminarily revokes the outpatient status of the defendant," and with the consent of defendant and his counsel, ordered Valencia confined "pending a hearing pursuant to . . . section 1608 regarding revocation of the outpatient status."

**Evidentiary hearing April–July 2013**

At the April 11 hearing (which began late due to transport issues for Valencia), the prosecutor offered to submit on the report; Dr. Weilbacher was again present. Valencia called 10 witnesses, including coworkers, relatives, family friends, and employees of the state hospital (a psychiatrist, a social worker, a psychiatric technician, and a registered nurse) to testify regarding specific infractions identified in the request for revocation. The court put the hearing over to the next day but counsel for Valencia requested "more than two weeks." With Valencia's consent, the court set the continued hearing for

9

May 9.  On May 9, the hearing was continued to May 30 due to court congestion.  On May 30, the hearing was rescheduled to June 13 as both the trial judge and Valencia's counsel were unavailable.

On June 13, Valencia's girlfriend Gloria Villagomez testified that they had lived together for six years until January 2013.  Dr. Weilbacher had called her around 10 times, and Villagomez never told her that Valencia was angry, threatened her (even in play), was paranoid about the government, or that she did not know how Valencia spent his money or that he became agitated and upset while discussing finances.  She never told the psychiatrist that he did not have much contact with his family or was aggressive with her.  She never read Dr. Weilbacher's report.

Valencia testified that while in outpatient care he worked full-time at Goodwill and then part-time at Dollar Tree.  He moved out of the apartment he shared with Villagomez when he was placed in board and care in December 2012.  He had been overpaid by social security, and the outpatient program helped him fill out forms to address the overpayment.  He had borrowed $600 a month for six months from the outpatient program to subsidize his rent and was trying to pay that back.  Valencia had talked to his former therapist about his spending in a short period $5,000 he received from social security, but after he showed all his receipts the therapist had no problem with it.  The court continued further testimony to July 11, 2013 with the consent of Valencia and his counsel.

On July 11, Valencia resumed his testimony.  He explained that had made several cash withdrawals in one day because he preferred to take out twenties rather than $100 because he didn't want to carry so much money.  He never discussed an unpaid phone bill with his girlfriend or raised his voice to her, and he had contact with his family "all the time."  He never gambled, instead giving away a sweatshirt and shoes with what he thought was the approval of staff, although he knew written approval of his therapist was required.  When he was purportedly AWOL he was actually drinking water in the bathroom, and he did not hear the page because of freeway noise.  On cross-examination

10

he denied all the alleged infractions, and did not know why the people who reported them had done so.

The prosecution then called Dr. Weilbacher, who testified that she worked for the FCTP outpatient program as a forensic psychologist, and Valencia was on her case load. She had spoken to his girlfriend on the phone 10 times from mid-November to mid-December 2012. Villagomez disclosed that after Valencia had lost his job at Goodwill in April 2012 he became more agitated and stressed, raised his voice, and threw clothing at her, threatening once that his family would do something to her. Referring to notes of her conversations with Villagomez, Dr. Weilbacher stated that Villagomez had said Valencia was still blaming the federal government for his problems. (The court received Dr. Weilbacher's notes into evidence.)

Dr. Weilbacher also had been contacted the night in January 2013 when Valencia was AWOL. She knew that social security had advised Valencia that he had been overpaid $18,000 by social security and should no longer receive benefits, but nevertheless he continued to use checks as they arrived, which showed financial irresponsibility or inability, an issue she considered with all her clients. The five ATM withdrawals were consistent with his diagnosis of "schizo-effective disorder bipolar type." Other residents watching the same football game with Valencia had reported to the program director that he had gambled with his shoes and his sweatshirt. The facility needed "strict permission" for Valencia to ride in a car with anyone, requiring background checks, and Valencia's ride with the unapproved male driver was another violation. Valencia's denial of each of the infractions was consistent with his diagnosis of narcissistic personality disorder; "he rewrites history in a sense to benefit himself." Dr. Wielbacher saw two reasons for concern whether Valencia was a danger to himself or others; first, his behavior with his girlfriend, which led to his being pulled from the apartment, and second, his habitual rule violations. Although Valencia was first placed in the FCTP, "a luxury for most clients," when he did not conduct himself appropriately at the satellite facility, revocation was the next step. On an objective measure of

11

dangerousness, Valencia remained at a high level with several characteristics of psychopathic tendency.

The trial court explained that she had on March 14 "preliminarily revoked the outpatient status with the oral consent of defendant and counsel" and ordered Valencia confined pending a "hearing pursuant to [section] 1608." Counsel for Valencia objected to the lack of notice, pointing out that the January 28 letter was not referenced to either counsel and stated that another report was forthcoming, making it hard for Valencia's counsel to prepare to proceed to a hearing in 15 days. The report itself was nonspecific and made subpoenas difficult. Counsel also challenged the substance of the report, especially as to the AWOL, arguing that staff did not search hard enough for Valencia, and submitted.

The court acknowledged its concern about the 15-day period, the difficulty getting Valencia into court, and the need for a longer period of time to allow Valencia's counsel to subpoena witnesses and have the hearing. "[W]hat is contemplated when it's a revocation of outpatient status in the context of a 15-day hearing. And is that a preliminary hearing based on a report or does it contemplate an evidentiary hearing? When I hear due process—and I concur—due process means evidence. But what isn't terribly clear is what shape does that take?" The timeline had been breached, but the remedy was not to send Valencia back to outpatient, and counsel had agreed with the setting of the hearing.

Valencia's counsel agreed: "I'm still fine with this. But I need to make a record of objection in case it's appealed." The court pointed out "that record was never made . . . . You never objected to it up front. You are objecting now. It's untimely now. That was an objection that could have been made and I didn't hear that at the time." Counsel stated, "I thought when we were discussing it that I was voicing my objection," and the court responded, "The record is what it is."

The court approved the revocation of outpatient status. Valencia had a "fixed ideology of paranoid ideation" regarding the federal government. The court summarized the evidence, commented that she observed Valencia's complete failure to take

12

responsibility on the witness stand, and concluded that Valencia would present a danger to himself or to others while on outpatient status.

This timely appeal followed.

## DISCUSSION

**I.    The section 1608 hearing did not violate due process.**

Procedural due process requires notice and a hearing before revocation of outpatient status.  (*In re McPherson* (1985) 176 Cal.App.3d 332, 337–338.)  Section 1608 provides:  "If at any time during the outpatient period, the outpatient treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court in . . . the county which approved outpatient status . . . of such opinion by means of a written request for revocation of outpatient status. . . .  [¶]  Within 15 judicial days, the court where the request was filed shall hold a hearing and shall either approve or disprove the request for revocation of outpatient status.  If the court approves the request for revocation, the court shall order that the person be confined in a state hospital or other treatment facility approved by the community program director. . . ."  The standard of proof for approving a revocation of outpatient status is a preponderance of the evidence.  (*People v. DeGuzman* (1995) 33 Cal.App.4th 414, 419.)

Valencia argues that the evidentiary hearing violated his right to due process because by the time it concluded in July, nearly six months had elapsed since the February 1, 2013 request for revocation.

As described above, the initial setting of the hearing for February 25 was pursuant to a February 7 request by the public defender; the sheriff requested a continuance to February 28; and on February 28, with the agreement of Valencia's counsel, the hearing was set for March 14, 2013.  At the March 14 hearing, Valencia's counsel requested a continuance so that she could subpoena witnesses.  It was the trial court who was concerned about the statute's provision that the court hold a hearing to approve or disapprove the request in 15 days.  After explaining how the period had elapsed without a determination due to vacations, transport issues, and counsel's request for more time, the

13

court indicated it was prepared to make a summary ruling, with a later full evidentiary hearing on the merits.  After conferring, Valencia and his counsel agreed to the summary ruling "without any prejudice to your due process rights . . . to have a hearing on the actual merits," and the court approved the revocation of outpatient status.

When the hearing resumed on April 11 (the date requested by Valencia's counsel), it began late due to Valencia's delayed transport from the hospital.  Valencia called 10 witnesses, and the court proposed resuming the next day, but Valencia's counsel requested two more weeks.  On the next date, May 9, the hearing was continued to May 30 because of court congestion.  The trial court and Valencia's counsel were unavailable on May 30 and a further rescheduling put the hearing over to June 13.  At that hearing, Valencia's girlfriend testified, followed by Valencia himself; with the consent of Valencia and his counsel, the hearing was continued to July 11.  On that date, Valencia completed his testimony, Dr. Weilbacher testified, counsel argued, and the court approved the revocation.

Valencia does not argue that the failure to hold the full hearing within 15 days was in itself a due process violation, acknowledging that the statutory period confers "the right and ability to be heard . . . at some time close to" the revocation of his inpatient status.  Before the enactment of section 1600, the standard was "such a hearing 'must be held as soon as is reasonably possible following the patient's return to the hospital.'" (*In re McPherson*, *supra*, 176 Cal.App.3d at p. 338.)  Further, "[w]ith respect to time limit statutes, the general rule is that 'requirements relating to the time within which an act must be done are directory rather than mandatory or jurisdictional, unless a contrary intent  is clearly expressed.'" (*People v. Fernandez* (1999) 70 Cal.App.4th 117, 128–129; see *id*. at pp. 129–130 [listing statutes with directory deadlines].)

Counsel belatedly objected to the lapse of the 15-day period on the last day of the evidentiary hearing, hoping to preserve her objection on appeal.  As the court stated, counsel (and Valencia) earlier had expressly agreed to the summary approval pending the full hearing.  Counsel did so to ensure that Valencia could present all his witnesses, which she had acknowledged would not be possible in fifteen days.  It was counsel's

14

effort to obtain the process due to Valencia (and her request for continuance) which required more time than the statutory period.

Valencia does challenge various other aspects of the "tardy and confused" hearing as prejudicing him in several ways. Again, the postponement of the hearing was due in large part to Valencia's repeated requests for continuances, and it was the court, not Valencia's counsel, that was most concerned that counsel's requests for more time repeatedly postponed the hearing. Nevertheless, we consider them in turn.

Valencia argues that he was prejudiced when his attorney presented his case first. This ignores that at the start of both the March 14 and April 11 hearings, the prosecution submitted on the basis of the January 28 notification and the February 1 request for revocation. At the April 11 and continued hearings, Valencia presented his witnesses to challenge the events described in the reports, and Dr. Weilbacher testified in rebuttal regarding the evaluations she conducted as documented in the (already submitted) request for revocation.

Valencia contends that his case depended on the trier of fact assessing his intellectual and emotional state at the time of the events described in the request for revocation. His demeanor was therefore critical to the trial court's determination whether to approve rehospitalization, and he was prejudiced because the court could not observe his demeanor closer to the time of the infractions described in the request for revocation. Valencia's demeanor at the hearing, however, was not the issue. Rather, the question before the court was whether the revocation of his outpatient status was supported by a preponderance of the evidence at the time of the February 1 request for revocation, based on the rule infractions, financial irregularities, conflict with his girlfriend, and other misconduct described in the request for revocation. Beyond commenting that Valencia absolutely refused to take responsibility and explained everything away during his testimony, the court made no comment on his demeanor, and we fail to see how Valencia would have benefitted had he had an earlier opportunity to deny the contents of the request for revocation.

15

We also reject Valencia's assertion that because of the delay in the completion of the hearing, the court was confused whether to review the request for revocation or to determine what treatment Valencia required at the time of the hearing. The court expressed repeatedly that the specific issue before it was whether to approve or disapprove the revocation, and stated on the record it would not consider more recent reports it had received before the last hearing date.

Finally, Valencia claims prejudice from irrelevant matter admitted at the hearing, during cross-examination and during direct examination by his own counsel. He did not object to the testimony on cross-examination (regarding alleged witnesses to the events detailed in the request for revocation), and his own counsel elicited whether he was dangerous at the time in the hospital, opening this issue to cross-examination by the prosecutor. He has waived this claim. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 318.) Further, we do not see how delay caused the admission of the objected-to testimony.

We find no merit to Valencia's claim of prejudice.

## II. Substantial evidence supports the court's revocation of outpatient status.

Valencia claims that there was insufficient evidence to support the revocation of his outpatient status. (See *In re McPherson*, *supra*, 176 Cal.App.3d at pp. 341–342.) We disagree.

The standard of proof is a preponderance of the evidence. (*People v. DeGuzman*, *supra*, 33 Cal.App.4th at p. 419.) The request for revocation detailed Valencia's infractions and erratic behavior, and Dr. Weilbacher testified in support of the findings. Valencia points out that he offered explanations for the behaviors, and his girlfriend denied having told Dr. Weilbacher about any threat and other behaviors. But the court was entitled to resolve contradictions in the evidence and to determine the credibility of the witnesses. Substantial evidence supported the trial court's revocation of outpatient status.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.