Filed 2/7/23 P. v. Shadan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>CYRUS LAWRENCE SHADAN,<br><br>     Defendant and Appellant. | H049426<br>(Santa Clara County<br>Super. Ct. No. CC513277) |

## I.  INTRODUCTION

Defendant Cyrus Lawrence Shadan appeals from the trial court's order revoking his outpatient mental health status (Pen. Code, § 1608),[1] after he was found not guilty by reason of insanity in 2006 to several charges.

Defendant raises three challenges to the trial court's revocation order. First, he challenges application of section 1608 to his revocation hearing, asserting that "[t]o the extent section 1608 permits incarceration instead of outpatient treatment for a patient who was once deemed safe for the community, without additional proof of dangerousness, it is not in accord with Supreme Court precedent and is a violation of [defendant's] due process rights." Second, defendant asserts that the trial court's ruling was "based on an erroneous interpretation of material facts," asserting that the trial court gave too little weight to the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

defense witness's testimony and too much weight to testimony from the prosecution's witnesses. Finally, defendant alleges that his constitutional equal protection right was violated, contending (as he did in his first issue) that patients found not guilty by reason of insanity should not have their outpatient status revoked unless the trial court finds the patient represents a danger to others.

For reasons that we will explain, we affirm the trial court's order.

## II. BACKGROUND

### A. *The Charges and Pleas*

In December 2005, Santa Clara police responded to a report that defendant stabbed his mother in the shoulder. As a result of this incident, defendant was charged by complaint with assault with a deadly weapon (§ 245, subd. (a)(1); count 1), battery causing serious bodily injury (§§ 242-243; count 2), criminal threats (§ 422; count 3), attempting to dissuade a witness (§ 136.1, subd. (b)(2); count 4), and misdemeanor resisting arrest (§ 148, subd. (a)(1); count 5). The complaint also alleged that defendant personally used a deadly and dangerous weapon as to counts 1, 3, and 4 (§§ 667, 1192.7, 12022, subd. (b)(1)) and that he personally inflicted great bodily injury as to counts 1 and 2 (§§ 667, 1192.7, 1203, subd. (e)(3), 12022.7, subd. (a)). The complaint further alleged that defendant had suffered a prior strike conviction. (§§ 667, subds. (b)-(i), 1170.12.) Defendant pleaded no contest and admitted the allegations, and also pleaded not guilty by reason of insanity to these charges. After defendant was evaluated by mental health practitioners, he withdrew his no contest pleas to counts 2 and 4, and on motion of the prosecutor, the court dismissed these counts. The trial court found defendant not guilty by reason of insanity on the remaining counts, and it referred defendant to the South Bay Conditional Release Program (CONREP) for an evaluation.

### B. *Defendant's Mental Health Treatment*

On October 17, 2006, the trial court, acting on South Bay CONREP's recommendation, found that defendant had not fully recovered his sanity and ordered

defendant committed to the State Department of Mental Health (now the State Department of State Hospitals) for placement, care, and treatment pursuant to section 1026.[2]  The trial court also set defendant's maximum term of commitment under section 1026.5.

Defendant remained in inpatient care at a state hospital until 2008.  At that point, the hospital director certified that defendant had improved such that he would no longer represent a danger to the health and safety of others while in outpatient status, and that defendant would benefit from being in outpatient status.  Accordingly, the trial court granted defendant outpatient status under section 1604, under the supervision and treatment of South Bay CONREP.  The trial court later ordered defendant transferred from South Bay CONREP to Sonoma County CONREP.  For the next several years, the trial court approved one-year extensions to defendant's outpatient commitment, each time finding that defendant continued to suffer from a mental illness and would represent a danger to the health and safety of others without involuntary outpatient treatment.[3]

In May 2014, however, the trial court temporarily revoked defendant's outpatient status and ordered defendant placed in a state hospital.  The trial court took this action on the recommendation and request of Sonoma County CONREP, with the agreement of defendant's counsel.  Later that year, CONREP petitioned the trial court to fully revoke defendant's outpatient status, alleging that defendant's mental health condition had not stabilized and he remained uncooperative with outpatient treatment and supervision.  The

---

[2] In pertinent part, section 1026 provides:  "Prior to making the order directing that the defendant be committed to the State Department of State Hospitals or other treatment facility or placed on outpatient status, the court shall order the community program director or a designee to evaluate the defendant and to submit to the court within 15 judicial days of the order a written recommendation as to whether the defendant should be placed on outpatient status or committed to the State Department of State Hospitals or other treatment facility."  (§ 1026, subd. (b).)

[3] Outpatient status "shall be for a period not to exceed one year."  (§ 1606.) Following the one-year period, the trial court may extend a person's outpatient commitment for up to an additional year following notice and a hearing.  (*Ibid.*)

trial court granted the petition in November 2014, fully revoking defendant's outpatient status and committing defendant to Napa State Hospital.

In 2018, defendant petitioned the trial court to transfer him back to outpatient status. Following a hearing, the trial court granted defendant's petition for transfer to outpatient treatment, ordering defendant released to South Bay CONREP. In July 2020, however, the trial court approved a request to temporarily revoke defendant's outpatient status again, ordering defendant committed to Napa State Hospital. South Bay CONREP made this request because it determined defendant had shown "increased paranoia, delusional thinking, anxiety, rumination, agitation and sleep irregularities" over several weeks, because he "engaged in aggressive communication (i.e. yelling and cursing) at housemates and room and board staff," because defendant had "limited insight into how his mental illness impacts his aggressive acts," and because defendant had violated CONREP conditions by communicating with his father outside of supervised contacts and then lying about it and by visiting pornographic sites on his cell phone. Defendant was not actually placed in Napa State Hospital until October 2020, where he remained in inpatient care until the revocation hearing that is the subject of this appeal.

## C. *The Revocation Hearing*

In January 2021, South Bay CONREP petitioned the trial court to fully revoke defendant's outpatient status, beyond the temporary revocation the court had already approved. South Bay CONREP's request asserted that defendant's behavior warranted continued hospitalization because defendant was "not responding well to the established treatment modality resulting in further increasing risk of harm to others," and defendant had not successfully accomplished any of his established treatment goals.[4] The request cited

---

[4] South Bay CONREP's request to revoke defendant's outpatient status also cited an incident in which defendant's father allegedly made a threat over the telephone against Napa State Hospital. Defendant moved at the revocation hearing to exclude any evidence of defendant's father's statement, and the prosecution agreed not to elicit such evidence.

section 1608 as its basis.  Section 1608 provides that an outpatient treatment supervisor may file a request with the trial court to revoke a patient's outpatient status if "the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision . . . ."[5]  South Bay CONREP's request alleged that defendant "remains a danger to himself and can no longer be safely treated in the community," and thus South Bay CONREP requested the court revoke defendant's outpatient status.

The hearing on the revocation request took place on June 17 and June 21, 2021. During the hearing, the parties and the court repeatedly discussed the relevance of evidence concerning defendant's potential dangerousness.  For instance, in preliminary discussions regarding whether evidence of defendant's criminal history could be introduced, the prosecutor argued:  "What I have to prove is that [defendant] either needs the extended inpatient treatment, or that he does not want outpatient treatment.  So is risk assessment is [sic] relevant?  I think it is."  Later, in ruling on a defense objection to a question about whether defendant posed a risk of harm to others, the trial court suggested that defendant's

---

[5] In full, section 1608 provides:  "If at any time during the outpatient period, the outpatient treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court in either the county which approved outpatient status or in the county where outpatient treatment is being provided of such opinion by means of a written request for revocation of outpatient status. The community program director shall furnish a copy of this request to the defense counsel and to the prosecutor in both counties if the request is made in the county of treatment rather than the county of commitment.  [¶]  Within 15 judicial days, the court where the request was filed shall hold a hearing and shall either approve or disapprove the request for revocation of outpatient status.  If the court approves the request for revocation, the court shall order that the person be confined in a state hospital or other treatment facility approved by the community program director.  The court shall transmit a copy of its order to the community program director or a designee.  Where the county of treatment and the county of commitment differ and revocation occurs in the county of treatment, the court shall enter the name of the committing county and its case number on the order of revocation and shall send a copy of the order to the committing court and the prosecutor and defense counsel in the county of commitment."  (§ 1608.)

risk could be relevant to the question of what type of treatment defendant required. Additionally, in rebuttal argument, the prosecutor noted that while the question of whether defendant presented a risk of violence was "definitely relevant," "it's not exactly what I need to prove." Despite this, defendant did not raise any constitutional concerns with the fact that section 1608 does not require a showing that defendant was dangerous in order to revoke his outpatient status.

Two South Bay CONREP witnesses testified: Eloy Jimenez, Jr., a group counselor and coordinator; and Ramiro Carrillo, community programs director. Jimenez testified that he worked with defendant and saw defendant three to four times a week while defendant was in outpatient treatment in 2019 and 2020. Jimenez testified that defendant's presentation "[f]luctuated quite frequently," and that defendant had to be removed from therapy groups "[m]ultiple times" due to difficulty regulating his emotions in the group sessions. Jimenez described a time when defendant called him using "pressured speech" about wanting to start an intimate relationship with the only female in the board and care facility. Jimenez also testified that although there were times when defendant was more collected and participated productively in therapy groups, defendant would then regress. Jimenez offered his opinion that defendant was not amenable to outpatient treatment because he "self-victimizes" and "everything around him is triggering."

On cross-examination, Jimenez stated that he had not interacted with defendant for more than a year, that Jimenez had reviewed no records from defendant's latest time in inpatient treatment, and that Jimenez was not aware what progress defendant had made in inpatient treatment or what defendant's mental condition was at the time of the hearing. Jimenez also testified on cross-examination that he was not actually present for several interactions with defendant that Jimenez had testified to, and that Jimenez was just conveying what others wrote in notes about these interactions. Based on this latter issue, the trial court denied a motion to strike Jimenez's testimony as hearsay, but the trial court stated it would not give this portion of Jimenez's testimony "much weight."

6

Carrillo testified as an expert in the diagnosis and treatment of mental disorders, in assessing the risk of harm that someone poses to others, and in determining amenability for outpatient treatment and the appropriateness of revocation. Carrillo testified that defendant was diagnosed with schizoaffective disorder, bipolar type, which can cause symptoms that include hallucinations, delusions, paranoia, disorganized or rapid thoughts, and difficulty with impulse control. Carrillo opined that defendant required extended inpatient treatment as opposed to outpatient treatment, because defendant lacked insight into his mental illness, because defendant violated "numerous" terms and conditions while in outpatient treatment, and because defendant was unwilling to work with his treatment team.

On cross-examination, Carrillo acknowledged that he had never met defendant or spoken to him, and that Carrillo's knowledge of defendant was based solely on a review of defendant's records. Carrillo also testified that the most recent report he had reviewed concerning defendant's progress was from March or April 2021, and that Carrillo had not spoken with any mental health professional at Napa State Hospital in the previous six months about defendant's present insight or willingness to work within the CONREP system while in outpatient status.

Defendant called one witness, Amelia Hughes, a licensed clinical social worker at Napa State Hospital. Hughes testified that defendant was one of the patients in Hughes's unit, and that she saw defendant at least two times a week in the hospital. She testified that she saw no aggressive or high-risk behaviors, verbal or physical aggression, property damage, need for seclusion or restraints, escape attempts, unit rule violations, sexually inappropriate behavior, self-injury or suicidal behaviors, or intrusive or disruptive behavior from defendant during that time. Hughes testified about several actions she observed that indicated defendant could function in outpatient treatment. She testified that defendant complied with taking his medication in the hospital. She stated that defendant showed an improved understanding of how to interact with his family, including defendant's father, whose relationship with defendant had been "very turbulent" and a "huge trigger" for

7

defendant. Hughes testified that defendant had done well in substance abuse treatment for his previous marijuana use. She also stated that defendant took ownership of the issues that prompted his return to inpatient treatment. Hughes thus expressed her belief that defendant "would be safe under the supervision of CONREP," and that defendant does not pose a "high risk" in the community.

On cross-examination, Hughes stated that as a social worker, her role is to "advocate" for her clients at Napa to help them reach their goals, provided that the goals are "within reason." She stated that typically, a patient would need to be moved to a discharge unit before Napa State Hospital would recommend the patient's release to outpatient treatment, and that defendant was not in a discharge unit. Hughes testified that defendant's treatment team believed that none of the objectives for defendant's treatment were fully met, with most of the objectives partially met and one objective not met at all. Hughes stated that her opinion that defendant was ready for release to outpatient treatment was her own, not the opinion of the Napa State Hospital treatment team. She testified that she did not disagree with the treatment team's conclusion that defendant's discharge criteria were not fully met, but added, "I certainly have my own [opinion], which I think was made clear, but I can have both, right?"

Finally, defendant testified on his own behalf. Defendant stated that he has been diagnosed with schizoaffective disorder, bipolar type, and that he has suffered from paranoia, delusions, mania, and depression. He testified that while at Napa State Hospital, he had been attending several group sessions, learning how to use his coping skills, and developing a relapse prevention plan. Defendant stressed that he had not been cited for any rule violations since joining Hughes's inpatient unit, that he was clean from his previous marijuana use and was attending Marijuana Anonymous, and that he had not committed any violent acts during his previous outpatient treatment periods. He testified that if released to outpatient care, he would reach out to his treatment team if he needed support, follow his relapse prevention plan, obey outpatient terms and conditions, attempt to improve his

8

relationship with his father, and continue to remain compliant with his medication instructions.

Defendant also described conditions that displeased him at two board and care homes he had stayed at before returning to inpatient care, and stated that if he encountered similar conditions upon being released to outpatient treatment, he would attempt to advocate for himself to get the conditions improved. He testified that he was "optimistic" and hoped "there is a change within the program." On cross-examination, defendant stated that if conditions were not better in some respects, he would "probably" not want to be in CONREP, though he hoped living conditions would improve. He also acknowledged breaking some curfew conditions of the board and care home.

The trial court granted the request to revoke defendant's outpatient status. The court noted that under section 1608, the prosecution was required to prove by a preponderance of the evidence either that defendant required extended inpatient treatment, or that the defendant refused to accept further outpatient treatment and supervision. The trial court then issued the following findings: "Specifically, the [c]ourt finds [defendant] requires extended inpatient treatment. Based on this finding, the [c]ourt did not find it necessary to rule on whether [defendant] refuses to accept further outpatient treatment and supervision. However, if necessary, the [c]ourt did not think that alternative was satisfied." The trial court also noted that Hughes testified that defendant was not in the discharge unit, that Hughes had recently agreed with the treatment team that defendant was not ready for discharge, and that defendant had only partially met his discharge criteria. The court concluded concerning Hughes: "This testimony was inconsistent with her direct testimony that she believed [defendant] was ready to be discharged. These inconsistences were not specifically addressed or reconciled. This had an impact on her credibility and the weight of her testimony." The court also found the testimony from Jimenez and Carrillo credible.

Defendant timely filed a notice of appeal challenging the trial court's order.[6]

## III. DISCUSSION

### A. *Due Process/Equal Protection Violation*

Defendant challenges the application of section 1608 to his case on two constitutional grounds. Both challenges concern the fact that section 1608 does not require a showing that a patient represents a danger to others in order to revoke the patient's outpatient status. Defendant first challenges the statute on due process grounds. Defendant cites *Foucha v. Louisiana* (1992) 504 U.S. 71 for the proposition that to be civilly committed, a person must be shown to be mentally ill and to require hospitalization for the person's own welfare and the protection of others. He cites *Jones v. United States* (1983) 463 U.S. 354 in arguing that a committed acquittee is entitled to release when the person has recovered his or her sanity or is no longer dangerous. As we understand his argument, defendant states that these authorities require a finding of dangerousness in order to revoke defendant's outpatient status, relying upon *People v. Beck* (1996) 47 Cal.App.4th 1676 for this position.

Defendant's equal protection argument asserts that persons who are civilly committed to a mental health institution and mentally disordered offenders are entitled to treatment provided in ways "that are least restrictive of the personal liberty of the individual." (Welf. & Inst. Code, § 5325.1, subd. (a).) He argues that he is similarly situated to persons facing civil commitment and mentally disordered offenders, and thus he is entitled to treatment in the least restrictive environment. As part of his equal protection argument, defendant also asserts that the trial court was required to make its own decision as to whether to revoke defendant's outpatient status, and the court should have declined to revoke defendant's outpatient status where there was no evidence that defendant presented a danger to others.

---

[6] "Orders denying outpatient status are appealable under section 1237, subdivision (b) (orders after judgment affecting the substantial rights of a party). [Citation.]" (*People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2.)

Section 1026 provides that if the trier of fact "finds the defendant was insane at the time of the offense, the trial court shall commit the defendant to a state hospital or other appropriate public or private facility for the care and treatment of the mentally disordered, or place the defendant on outpatient status pursuant to section 1600 et seq. (§ 1026, subd. (a); [citations.]." (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1431.) "Subsequent release from a state hospital after an insanity commitment occurs upon (1) restoration of sanity pursuant to section 1026.2, (2) expiration of the maximum term of commitment under section 1026.5, or (3) approval of outpatient status under section 1600 et seq. [Citation.]" (*People v. Cross* (2005) 127 Cal.App.4th 63, 72 (*Cross*).)

"[A] defendant may be placed on outpatient status upon the recommendation of the state hospital director and the community program director with the court's approval after a hearing. (§ 1603; [citation].)" *Cross*, *supra*, 127 Cal.App.4th at p. 72. "However, " '[o]utpatient status is not a privilege given the [offender] to finish out his [or her] sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue hazard to the community." [Citation.]' [Citation.]" (*Ibid.*)

Once a person has been placed in outpatient status, that status may be revoked under either section 1608 or section 1609. Section 1609 governs revocation proceedings initiated by the prosecution, while section 1608 covers requests to revoke a person's outpatient status if the outpatient treatment supervisor "is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision . . . ." (§ 1608.) "Section 1608 requires a finding that the patient needs extended inpatient treatment or refuses to accept further outpatient treatment. It does not require the court to find that the patient is a danger to the health and safety to others." (*People v. DeGuzman* (1995) 33 Cal.App.4th 414, 420 (*DeGuzman*).)

11

Defendant did not present his due process and equal protection claims to the trial court, despite raising several motions in limine to the court and even though the question of whether dangerousness was relevant to these proceedings came up several times during the hearing. As a general rule, "a party may forfeit [the] right to present a claim of error to the appellate court if he did not do enough to 'prevent[]' or 'correct[]' the claimed error in the trial court . . . ." (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) "The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation]' [Citations.] Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Defendant forfeited his constitutional claims by not raising them in the trial court, despite the opportunity to do so and despite the fact that the cases he cites on appeal in support of his position were all decided well before his hearing. If defendant had raised these claims to the trial court and if the trial court had found merit in defendant's position, the trial court could have received evidence on the question of defendant's dangerousness and determined whether defendant presented a danger to others. Because defendant did not raise these claims in the trial court, we do not have the benefit of any record on this matter, and we will not consider these issues in the first instance here.

### B. *Sufficiency of the Evidence*

In reviewing an order revoking outpatient status under section 1608, we uphold the trial court's factual findings if supported by substantial evidence. (*DeGuzman, supra*, 33 Cal.App.4th at p. 420.) The prosecution bears the burden of proof at a revocation of outpatient status hearing to demonstrate by a preponderance of the evidence that the patient requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision. (*Id.* at pp. 419-420.) We review the trial court's order regarding outpatient

12

status for an abuse of discretion. (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900.) "Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. [Citation.] . . . '[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' [Citation.]" (*Cross*, *supra*, 127 Cal.App.4th at p. 73.)

Substantial evidence supports the trial court's decision to revoke defendant's outpatient status. Both CONREP witnesses (whom the trial court found credible) testified about difficulties defendant had functioning in an outpatient setting and following rules set forth by South Bay CONREP. While both prosecution witnesses lacked knowledge of defendant's subsequent progress in inpatient treatment, even Hughes, the defense witness who stated her role was to advocate for defendant, acknowledged that Napa State Hospital did not believe defendant was ready to transition to outpatient status because he was not in a discharge unit and none of his discharge criteria were fully met.

Defendant contends that the trial court erred when it "failed to consider that the [prosecutor's] witnesses had minimal contact with [defendant]" since his outpatient status was temporarily revoked a year before the hearing. However, the record reveals that the trial court was aware of this fact and weighed the witnesses' testimony accordingly. The trial court articulated that it recognized limitations in the CONREP witnesses' knowledge along with issues concerning Hughes's credibility. For example, the trial court stated it would not give portions of Jimenez's testimony that relied solely on case notes "much weight," and the trial court also recognized that Carrillo "didn't talk about any specific incidents or specific content . . ." concerning defendant. Nonetheless, the trial court found the testimony from Jimenez and Carrillo credible. The trial court correctly articulated the burden of proof, issuing findings that the prosecution satisfied its burden of demonstrating that defendant required extended inpatient treatment, but that the prosecution did not demonstrate that defendant refused to accept further outpatient treatment and supervision. The trial court concluded: "Based on the totality of the circumstances and facts presented

13

and giving each witness the weight this [c]ourt finds their testimony deserves, the [c]ourt finds, by a preponderance of the evidence, that the government has proven" that revocation of defendant's outpatient status was proper. The trial court's findings are supported by substantial evidence and we find no abuse of discretion in its revocation of defendant's outpatient status. (*DeGuzman, supra*, 33 Cal.App.4th at p. 420.)

## IV. DISPOSITION

The order of the trial court granting revocation of defendant's outpatient status under Penal Code section 1608 is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
LIE, J.

*People v. Shadan*
**H049426**